**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| NAVA Health MD, Inc., et al., | Case No. 26-10497-BFK |
| Debtors. | |

# OBJECTION TO DEBTORS' MOTION TO ASSUME LEASES

HCP MOP Fairfax VA, LP ("Landlord"), by and through its undersigned counsel, hereby files this Objection (the "Objection") to the Motion to Assume Leases (Doc. No. 133) (the "Motion"), filed by the debtors, NAVA Health, MD, Inc. ("NHMD") and NAVA Health Medical Group, LLC ("NHMG," collectively with NHMD, the "Debtors") on August 25, 2026. In support of this Objection, Landlord respectfully states as follows:

## BACKGROUND

1. Landlord is the owner and lessor of the real property located at 8316 Arlington Boulevard, Suite 206, Fairfax, Virginia 22031 (the "Fairfax Premises").

2. NHMG and Landlord executed that certain Base Year Medical Office Building Lease dated January 12, 2019, as amended (the "Fairfax Lease") for the Fairfax Premises. A true and correct copy of the Fairfax Lease is attached hereto as **Exhibit "A".**

3. On March 1, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") before this Court. The cases are jointly administered under Case No. 26-10497.

4. On August 25, 2026, the Debtors filed the Motion, seeking authority to assume the Fairfax Lease and certain other unexpired leases pursuant to 11 U.S.C. § 365. In the

Motion, the Debtors acknowledge that NHMG is in default and identify pre-petition arrearages under the Fairfax Lease in the amount of $29,970.93, representing unpaid rent for the months of January and February 2026. The Motion proposes to cure the arrearages within one year from the date of entry of an order approving assumption of the Fairfax Lease.

5. However, as of the Petition Date, the arrearage owed under the Fairfax Lease was $30,956.70. A Ledger demonstrating that amount is attached hereto as **Exhibit "B"**.

6. In addition, the Fairfax Lease specifically provides that attorney's fees and costs incurred by Landlord for collection of amounts owed by NHMG shall be due and payable by NHMG to Landlord. *See* Ex. A, ¶ 13.1(d). Through Thursday, September 10, 2026, Landlord incurred fees and costs in the amount of $8,090.00 directly resulting from NHMG's default, and fees and costs continue to accrue while this case persists.

7. Accordingly, the cure amount to be paid as a condition of any assumption of the Fairfax Lease is $39,046.70, as of September 10, 2026.

## OBJECTION

### A. The Proposed One-Year Cure Period is Not Prompt.

8. Section 365(b)(1) of the Bankruptcy Code provides, in relevant part, as follows:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of the contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonentary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a non-residential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with

> such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contact or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

9. While the Bankruptcy Code does not explicitly define the terms "cure" or "prompt cure," numerous courts have held that a prompt cure of a monetary default is one made at or around the time of assumption. *In re Allison*, No. 95-10776-AM, 1995 WL 930889, at *2 (Bankr. E.D. Va. Sept. 14, 1995) (citing *In re Lafayette Radio Electronics Corp.*, 9 B.R. 993 (Bankr.E.D.N.Y.1981); *see also In re Ortiz*, 675 B.R. 183, 198 (Bankr. D.S.C. 2025) ("a longer cure period may be 'prompt' if it is 'relatively short compared to the prospective length of the parties' future relationship.'"); *In re Embers 86th St., Inc.*, 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995) ("[c]uring requires payment of all rental arrearages and other money obligations at the time the lease is assumed.")

10. In determining whether a cure is "prompt," courts evaluate the specific facts and circumstances of the case. *Ortiz*, 675 B.R. at 198; *In re Uniq Shoes Corp.*, 316 B.R. 748, 751 (Bankr. S.D. Fla. 2004). Factors courts consider include the following: "(1) nature of leased property, (2) provisions of lease, (3) amount of arrearage under the lease, (4) remaining term of lease, and (5) provisions of debtor's proposed plan." *Ortiz*, 675 B.R. at 198. Other courts have considered "a debtor's past financial performance" and "any inequitable conduct engaged in by the non-debtor party." *Id*. at 751-52 (citing *In re Embers 86th Street, Inc.*, 184 B.R. at 900-01); *see also In re R/P Int'l Techs., Inc.*, 57 B.R. 869 (Bankr. S.D. Ohio 1985).

11. Applying the factors bankruptcy courts evaluate in determining whether a cure is prompt, the one-year cure period proposed in the Motion cannot be deemed a "prompt

cure." Here, the Debtor routinely failed to make timely rent payments in the months leading up to the Petition Date, incurring numerous late fees and, at times, accumulating balances of more than $53,000. *See* Ex. B. Moreover, the remaining term of the Lease is now less than three years. If the Debtor is permitted to cure the defaults over a year, the Debtor will have been in default under the terms of the Fairfax Lease for at least two of the final four years of the lease term (assuming the Debtor could even remain current going forward). The Landlord has already been compelled to wait months since the Petition Date without receiving payment of prepetition rent. A further year-long delay is unreasonable and prejudicial to the Landlord.

**B. NHMG Cannot Provide Adequate Assurance of Prompt Cure.**

12. NHMG also cannot provide the Landlord with adequate assurance of prompt cure. "[A]dequate assurance of a prompt cure requires that there be a firm commitment to make all payments and at least a reasonably demonstrable capability to do so." *Uniq Shoes Corp.*, 316 B.R. at 752 (citing *In re Embers 86th Street, Inc.*, 184 B.R. at 901); *see also Matter of World Skating Center, Inc.*, 100 B.R. 147, 148–149 (Bankr. D. Conn. 1989) (adequate assurance requires a foundation that is not speculative and is sufficiently substantive so as to assure the landlord that it will receive the amount of the default).

13. The Motion contains only conclusory statements that the Debtors are generating positive cash flow and have stabilized their operations. The Debtors further represent that additional funding is "anticipated" in connection with a Chapter 11 Plan, yet no plan has been filed in this case. Such vague assurances do not satisfy the statutory standard.

14. Indeed, the Debtors' own background, as described in the Motion, raises serious concerns about their long-term viability. According to the Motion, in 2024, the Debtors signed as many as sixteen new leases for a rapid expansion that ultimately failed. A planned merger

collapsed. Leases were abandoned, construction costs went unpaid, and a bridge loan was defaulted. These events precipitated the bankruptcy filing. Against this backdrop, bare assertions of "positive cash flow" and "stabilized operations," do not provide the Landlord with adequate assurance that the Debtors can and will perform under the Fairfax Lease going forward.

**C. The Cure Amount is Understated.**

15. As noted, the Bankruptcy Code requires that the debtor cure all default and compensate Landlord for any actual and pecuniary loss resulting from the default. 11 U.S.C. § 365(b)(1)(A).

16. The Motion identifies only $29,970.93 in pre-petition arrearages for the Fairfax Lease, representing January and February 2026 base rent. The Landlord submits that this amount does not represent the full cure amount owed under the Fairfax Lease. As of the Petition Date, the arrearage owed under the Fairfax Lease was $30,956.70. *See* Ex. A. In addition, Landlord has incurred fees and costs in the amount of at least $8,090.00 directly resulting from NHMG's default, which amounts continue to accrue.

**D. Reservation of Rights Regarding Any Future Assignment**

17. The Landlord reserves all rights with respect to any future assignment of the Fairfax Lease under 11 U.S.C. § 365(f), including the right to object to any proposed assignment and to demand adequate assurance of future performance from any proposed assignee pursuant to § 365(f)(2). No Chapter 11 plan has been filed in this case, and the ultimate trajectory of these cases remains uncertain. It is therefore essential that any order authorizing assumption of the Fairfax Lease expressly preserve the Landlord's rights to object to any subsequent assignment and to demand adequate assurance of future performance from any proposed assignee.

## **CONCLUSION**

WHERFORE, HCP MOP Fairfax VA, LP respectfully requests this Court enter an order (i) denying the Motion insofar as it seeks to assume the Fairfax Lease unless and until the Debtors agree to a prompt cure timeline; (ii) requiring the Debtors to provide a complete and accurate cure amount, inclusive of all amounts owed under the Fairfax Lease, before assumption is authorized; (iii) requiring the Debtors to provide adequate financial documentation, demonstrating adequate assurance of future performance under the Fairfax Lease, before assumption is authorized; (iv) preserving Landlord's rights with respect to any future assignment of the Fairfax Lease under section 365(f); and (v) granting such other and further relief as this Court deems just and proper.

Dated: September 14, 2026

Respectfully submitted,

/s/ J. Ellsworth Summers, Jr.
J. Ellsworth Summers, Jr. (VSB No. 45028)
BURR & FORMAN LLP
50 North Laura Street, Suite 3000
Jacksonville, FL 32202
Telephone: 904-724-7203
Facsimile: 904-232-7201
Email: esummers@burr.com

*Counsel to HCP MOP Fairfax VA, LP*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 14th day of September, 2026, I caused a true and correct copy of the foregoing to be served by electronic delivery to the parties registered to received notices through the CM/ECF system and mailed by United States First Class mail to the following:

Nava Health MD, Inc.
8316 Arlington Boulevard
Suite 206
Fairfax, VA 22031

Kevin M. O'Donnell, Esq.
Henry & O'Donnell, P.C.
300 N. Washington Street
Suite 604
Alexandria, VA 22314

U.S. Trustee
Matthew W. Cheney
Office of the U.S. Trustee
1725 Duke Street, Suite 650
Alexandria, VA 22314

/s/ J. Ellsworth Summers, Jr.
J. Ellsworth Summers, Jr.

# EXHIBIT "A"

JLA 11/2018
BY Preferred

**BASE YEAR MEDICAL OFFICE BUILDING LEASE**

THIS BASE YEAR MEDICAL OFFICE BUILDING LEASE (this "**Lease**") made as of the date set forth in Section 1 of the Summary of Basic Lease Information (the "Summary"), below, is made by and between **HCP MOP Fairfax VA, LP**, a(n) Delaware limited partnership, or its assigns ("**Landlord**") and Integrated Wellness MD, LLC, a(n) a Maryland limited liability company, d/b/a NAVA ("**Tenant**").

**<u>SUMMARY BASIC LEASE INFORMATION</u>**

| BASIC LEASE PROVISIONS | DESCRIPTION |
|---|---|
| 1. Effective Date | January 9, 2019 |
| 2. Building | 8316 Arlington Boulevard, Fairfax, Virginia 22031 (the "**Building**"), on the real property legally described in <u>Exhibit A.</u> |
| 3. Premises | Approximately 2,680 (2,414 usable) rentable square feet of the Building, more commonly known as Suite No. 206 (and as more particularly identified on <u>Exhibit B</u>). |
| 4. Term (Section 1) | |
| 4.1 Length of Term | ten (10) years, seven (7) months and zero (0) days |
| 4.2 Commencement Date | January 1, 2019 |
| 5. Rent (Section 2) | |
| 5.1 Base Rent | $8,263.33 |
| 5.2 Annual Base Rental Rate | $37.00/r.s.f. |
| 5.3 Annual Escalations | 2.75% of the then-current amount of the Base Rent. |
| 6. Tenant's Proportionate Share (Section 3.2) | 2.71%, which is subject to adjustments pursuant to Section 3 of the Lease. |
| 7. Base Year (Section 3.3) | 2019 |
| 8. Security Deposit (Section 3.6) | $8,263.33 |
| 9. Approved Services (Section 4) | medical office |
| 10. Tenant Improvement Allowance (Section 11) | N/A, subject to the terms and conditions of Section 11 of the Lease. |
| 11. Guarantor(s) (Exhibit E) | N/A |

This Summary shall be controlled by the specific terms and provisions of this Lease relating to the subject matter of those terms identified in the Summary.

***[REST OF PAGE INTENTIONALLY LEFT BLANK]***

**BASE YEAR MEDICAL OFFICE BUILDING LEASE**

**THIS LEASE** is entered into by and between the Landlord and Tenant as of the Effective Date set forth in Section 1 of the Summary.

Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed by Tenant as hereinafter set forth, hereby leases to Tenant and Tenant hereby leases from Landlord the premises set forth in Section 3 of the Summary (the "**Premises**")of that certain Building described in Section 2 of the Summary, ("**Building**"), for the term and upon the conditions and agreements hereinafter set forth ("**Lease**"). This Lease shall constitute a binding agreement between the parties effective as of the Effective Date.

**SECTION 1. TERM**

The commencement date ("**Commencement Date**") of the term of this Lease shall be that date set forth in Section 4.2 of the Summary, unless Landlord otherwise notifies Tenant in writing due to changes in Tenant's expected or actual occupancy date. The Commencement Date specified in such writing shall be binding on Landlord and Tenant. The length of the term of this Lease shall continue as further described in Section 4.1 of the Summary (plus any partial calendar months in which the Commencement Date falls) (such term and any extensions or renewals hereof, hereinafter called the "**Term**"). "**Lease Year**" means either (a) if the Commencement Date is on the first day of a calendar month, the twelve consecutive calendar month period that begins on the Commencement Date (the start of the first "Lease Year") and each twelve consecutive calendar month period thereafter (for the remainder of the Term) that begins on an anniversary of the Commencement Date or (b) if the Commencement Date is on a date other than first day of a calendar month, the first "Lease Year" shall commence on the Commencement Date and continue to the Rent Payment Date (defined below) that immediately follows the anniversary of the Commencement Date (i.e., the first "Lease Year" shall be a period of greater than 12 months but less than 13 full months) and, thereafter (for the remainder of the Term), each successive "Lease Year" shall be the twelve consecutive calendar month period that begins on the aforementioned Rent Payment Date or an anniversary thereof.

**SECTION 2. RENT**

2.1 Base Rent. During the Term, Tenant shall pay to Landlord Base Rent as set forth in Section 5.1 of the Summary, at the Annual Base Rental Rate identified in Section 5.2 of the Summary multiplied by the number of rentable square feet of the Premises (such sum is hereafter referred to as "**Base Rent**"), together with Additional Rent (as defined in Section 3.1). Base Rent shall be payable in monthly installments in advance without notice, demand, setoff or deduction and all such installments shall be paid to Landlord or its managing agent in U.S. Dollars. In no event shall Tenant have the right to withhold any Rent (as defined in Section 3.1) for any length of time regardless of whether any dispute exists relating to this Lease, the Premises, the Building or Tenant's occupancy of the Premises or the Building. Except as otherwise provided in Section 11, the first monthly installment of Base Rent shall be due on the Commencement Date and, thereafter, such monthly installments shall be due on the first day of each calendar month (each such date, a "**Rent Payment Date**"). If Tenant's obligation to pay Base Rent relates to only a part of a month at the beginning or the end of the Term, Tenant shall pay Landlord a proportionate part of the applicable monthly installment for each such partial month, which shall be payable at the same time as the first or last (as applicable) monthly installment is due under this Lease. On each anniversary of the Commencement Date during the term of the Lease, Base Rent shall be adjusted pursuant to Section 5.3 of the Summary ("Annual Base Rent Escalation").

2.2 Taxes on Rent. Tenant shall pay and be liable for all rental, sales and use taxes or other similar taxes, if any, levied or imposed on Rent payments. Such payments shall be in addition to all other payments required to be paid to Landlord by Tenant under the terms of this Lease. Any such payment shall be paid to Landlord concurrently with the payment of the Rent upon which such tax is based.

**SECTION 3. ADDITIONAL RENT**

3.1 Additional Rent. In addition to Base Rent, Tenant shall pay Landlord "**Additional Rent**", which term shall include the following:

(a) "Tenant's Proportionate Share" of "Excess Operating Costs".

(b) any sum owed for separately metered utilities, including, without limitation, electricity, or as a Surcharge (as defined in Section 5); and

(c) any other sums owed by Tenant pursuant to this Lease or otherwise arising in connection with Tenant's occupancy of the Premises.

Base Rent and Additional Rent shall hereinafter be collectively referred to as "**Rent**".

3.2 Proportionate Share. "**Tenant's Proportionate Share**" shall mean the rentable area of the Premises divided by the rentable area of the Building on the last day of the calendar year for which Operating Costs (as defined in Section 3.5) are being determined. Except as provided expressly to the contrary herein, the rentable area of the Building shall include all rentable area of all space leased or suitable for lease in the Building, which Landlord may reasonably re-determine from time to time, to reflect any re-configurations, additions or modifications to the Building. If the Building, or any development of which it is a part, shall contain non-office uses, Landlord shall have the right to determine in accordance with sound accounting and management principles, Tenant's Proportionate Share for only the office portion of the Building or of such development, in which event, Tenant's Proportionate Share shall be based on the ratio of the rentable area of the Premises to the rentable area of such office portion. If the Building shall be part of or shall include a complex development or group of buildings or structures collectively owned, leased or managed by or on behalf of Landlord or any of its affiliates, Landlord may allocate among the buildings within the complex or group of buildings those categories of Operating Costs which relate to any facilities which are for the common use or benefit of the complex or group of buildings, among such buildings in accordance with sound accounting and management principles. Such common use or benefit facilities shall include, but shall not necessarily be limited to, parking facilities and driveways, sidewalks, connecting bridges and corridors, lobbies, foyers and other public areas, maintained for the common benefit and use of buildings within the complex or group. For purposes of determining Tenant's Proportionate Share, but subject to Landlord's right to re-determine the rentable area of the Building from time to time pursuant to this Section 3, Landlord has calculated the rentable area in the Premises and the Building in its reasonable discretion with respect to the layout of multi-tenant floors. The rentable area in the Premises as set forth on Page 1 of this Lease is hereby stipulated to be the rentable area of the Premises for all purposes under this Lease, whether the same should be more or less as a result of minor variations resulting from actual construction and completion of the Premises and for actual occupancy; provided, however, in the event Landlord re-measures the Premises in accordance with commercially reasonable procedures and if the rentable area of the Premises is different than above stated, Landlord may give Tenant written notice of the change and the new number of square feet shall become the rentable area of the Premises for all purposes effective as of the date of such notice.

3.3 Base Year and Excess Operating Costs Defined. "**Base Year**" shall mean the calendar year as set forth in Section 7 of the Summary. "**Excess Operating Costs**" shall mean the excess, if any, of actual Operating Costs for any calendar year within the Term of this Lease, subsequent to the Base Year, over the amount of actual Operating Costs for the Base Year (hereinafter called "**Base Operating Costs**").

3.4 Payment of Tenant's Proportionate Share of Excess Operating Costs. Tenant shall be responsible for and shall pay Tenant's Proportionate Share of Excess Operating Costs for all periods during the Term of this Lease, regardless of whether its Proportionate Share of Excess Operating Costs is more or less than any estimate thereof provided by Landlord.

(a) By the first day of each month during the Term of this Lease, in addition to Base Rent due hereunder at such time, Tenant shall pay a monthly installment equal to 1/12th of Tenant's Proportionate Share of Excess Operating Costs. Before the beginning of each calendar year during the Term, Landlord may furnish Tenant with a statement of Landlord's estimate of Tenant's Proportionate Share of Excess Operating Costs for such calendar year. If Landlord fails to deliver such statement prior to January 1 of the applicable year, Tenant shall pay each month 1/12th of Tenant's Proportionate Share of Excess Operating Costs for the prior year, if any, until such statement is received. If Landlord furnishes Tenant such a statement, to the extent the new estimate is greater than or less than the estimates paid to date for such calendar year, a lump sum payment or credit shall be made in the next monthly payment to adjust for such differential and thereafter Tenant shall thereafter pay each month 1/12th of Tenant's Proportionate Share of Excess Operating Costs as set forth in the new estimate.

(b) Within 90 days after the end of each calendar year during the Term, Landlord shall furnish to Tenant a statement of actual Operating Costs and Tenant's Proportionate Share of Excess Operating Costs for the previous calendar year (provided Landlord's right to collect Tenant's Proportionate Share of Excess Operating Costs shall not be affected if Landlord fails to deliver such statement within such 90 day period). A lump sum payment will be made by Tenant, within 30 days of the delivery of that statement, equal to the excess, if any, of the actual amount of Tenant's Proportionate Share of Excess Operating Costs over all amounts paid by Tenant with respect to Tenant's Proportionate Share of Excess Operating Costs for the preceding calendar year. If the amount of Tenant's Proportionate Share of the Excess Operating Costs is less than the estimated amounts paid by Tenant with respect to Tenant's Proportionate Share of Excess Operating Costs for such calendar year, Landlord shall apply the difference (the "**Overage**") to the next accruing installment of Rent due hereunder or, if necessary, subsequently accruing installments of Rent until the entire Overage amount is credited; provided that if the Term of this Lease has expired at the time Landlord's Statement is delivered, Landlord shall refund the amount of any Overage within 30 days of the issuance of Landlord's Statement.

(c) In the event Tenant's Proportionate Share of Excess Operating Costs for the final calendar year of the Term is not finally calculated until after the expiration of the Term, then Tenant's obligation to pay the same and Landlord's obligation to refund any Overage shall survive the expiration or termination of this Lease. Accordingly, Landlord shall have the right to continue to hold without interest Tenant's security deposit, if any, following expiration of the Term until Tenant's Proportionate Share of Excess Operating Costs has been paid in full. Tenant's Proportionate Share of Excess Operating Costs for the calendar years in which the Term commences and ends, if any, shall be prorated on the basis of the number of days of the Term within each such calendar year.

3.5 Operating Costs Defined. "**Operating Costs**" shall mean all amounts paid or payable, whether by Landlord or by others on behalf of Landlord, arising out of the ownership, management, maintenance, operation, repair, replacement and administration of the Building and the land upon which the Building is located and any parking areas and facilities associated with the Building, including, without limitation:

(a) the cost of all real estate, personal property and other ad valorem taxes, parking surcharges, any tax or excise on rents, any franchise or gross margins tax, any tax or charge for governmental services (such as street maintenance or fire protection), any tax or charge now or hereafter implemented and reasonably determined by Landlord to have been assessed in lieu of the whole or part of any of the foregoing-described amounts, and any other levies, charges, impact fees and local improvement rates and assessments whatsoever assessed or charged against the Building, the land upon which the Building is located, the equipment and improvements contained therein or thereon, or on or in any part thereof, by any lawful taxing authority (collectively, "**Taxes**"), including all costs associated with the appeal of any assessment on Taxes;

(b) the cost of insurance obtained by Landlord, including, but not limited to, property insurance, liability insurance, rent interruption insurance, and any deductible amount applicable to any claim made by Landlord under any such insurance;

(c) the cost of security, landscaping, window cleaning, garbage removal, trash removal and all of the services provided to Tenant and other tenants of the Building by Landlord (other than any services which are separately billed to Tenant or any other tenants);

(d) the cost of heating, ventilating and air conditioning of the (i) Common Areas of the Building ("**Common Areas**" being defined for purposes of this Lease as areas of the Building that provide service to Building tenants but that are not part of any tenant's leased premises, possibly including but not limited to lobbies, atria, security desks, conference rooms, vending areas, lounges, food service facilities, locker or shower facilities, mail rooms, courtyards, mechanical or equipment rooms, washrooms, public corridors, elevators and stairwells), and (ii) the Premises and other rentable space in the Building, if the Building is equipped with a central or any shared heating, ventilating and air-conditioning system;

(e) the cost of all gas, water, sewer, electricity and any other utilities used in the maintenance, operation, use and occupancy and administration of the Building (including all rentable space in the Building) and the Common Areas, excepting, however, any such utilities separately metered or sub-metered to Tenant or any other tenants of the Building unless the cost of which separately metered or separately sub-metered utilities is the responsibility of Landlord;

(f) commercially reasonable amounts paid or payable for all personnel involved in the management, repair, maintenance, operation, leasing, security, supervision or cleaning of the Building, any Common Areas and the rentable space within the Building in accordance with Section 5 and the comparable provisions of other tenant leases;

(g) auditing, accounting and legal fees and costs related to the Building;

(h) the cost of repairing, operating and maintaining the Building, and the equipment serving the Building, including Common Areas, the Premises and other space;

(i) capital expenditures for improvements and/or equipment which are required by law and/or which are designed to result in a labor or cost savings, in which case the capital expenditures shall be amortized over the useful life of the improvements or equipment as determined by Landlord, not exceeding ten (10) years and shall be included on an annual basis in Operating Costs; and

(j) all other expenses, costs and disbursements of every kind and nature which Landlord shall pay or become obligated to pay in respect to or in connection with the operation and maintenance of the Building and which are usually considered "operating expenses" of a commercial office building in accordance with customary business practices, consistently

applied (including, if the Building is subject to a condominium form of ownership, all assessments, fees and charges relating to such condominium form of ownership or condominium units).

Notwithstanding anything above to the contrary, "Operating Costs" shall not include the following:

(1) Cost of any work or service provided to any tenant of the Building that is in addition to that which Landlord is obligated or permitted to provide to Tenant under the provisions of this Lease or the comparable provisions of the other tenant leases of the Building which costs are separately billed to such specific tenants.

(2) Costs of repairs or other work occasioned by fire, windstorm or other casualty or condemnation, to the extent reimbursed to Landlord by insurers or by governmental authorities in eminent domain.

(3) Leasing commissions, costs and disbursements incurred in connection with negotiations for leases with tenants, or prospective tenants of the Building and similar costs incurred in connection with disputes between Landlord and tenants or prospective tenants in the Building including attorneys fees incurred in connection therewith.

(4) Costs incurred in renovating, decorating, redecorating or otherwise improving unoccupied but leasable space in the Building.

(5) Costs of correcting defects in the construction of the **Building**, except that for the purposes hereof conditions resulting from ordinary wear and tear and use, fire, casualty, vandalism and other matters not occasioned by construction defects shall not be deemed to be defects.

(6) Depreciation and amortization, except as provided in Section 3.5(a) – (j) above.

(7) Costs (including penalties, fines and associated legal expenses) incurred due to the violation by Landlord of the terms and conditions of this Lease or of the leases of other tenants in the Building. Notwithstanding the foregoing, interest penalties, reasonable legal fees and other expenses incurred in connection with assessments or taxes which are reasonably contested by Landlord shall be included in Operating Costs.

(8) Fees and other compensation paid to any affiliate of Landlord for services on or to the Building to the extent that the costs of such services exceed competitive costs for such services rendered by persons or entities of similar skill, competence and experience who are not affiliates of Landlord.

(9) Interest on debt or amortization payments on any mortgages.

If the Building is not at least ninety percent (90%) occupied during any calendar year, "Operating Costs" shall be determined as if the Building had been ninety percent (90%) occupied during each such calendar year.

3.6 Security Deposit. Tenant will deposit with Landlord upon Tenant's execution of this Lease the sum set forth in Section 8 of the Summary as security for the performance by Tenant of all of Tenant's obligations hereunder. No interest shall be paid upon the security deposit nor shall Landlord be required to maintain the deposit in a segregated account, unless required by applicable law In the event that Tenant shall default in the full and faithful performance of any of the terms hereof, then Landlord may, without notice, either retain the security deposit as liquidated damages or retain the same and apply it toward any damages sustained by Landlord, including but not limited to actual, consequential or other damages arising from Tenant's default, including but not limited to any past due Rent. In the event of bankruptcy or other debtor-creditor proceedings, either voluntarily or involuntarily instituted by or against Tenant, the security deposit shall be deemed to be applied in the following order: to damages, obligations and other charges, including any damages sustained by Landlord, other than unpaid rent, due to Landlord for all periods prior to the filing of such proceedings; to accrued and unpaid rent prior to the filing of such proceeding; and thereafter to actual damages, obligations, other charges and damages sustained by Landlord and rent due the Landlord for all periods subsequent to such filing. In the event of a sale of the Premises or all or any portion of the Building, Landlord shall have the right to transfer the security deposit to the buyer, and Landlord shall thereupon be relieved of all obligations to return the security deposit to Tenant, and Tenant agrees to look solely to the buyer for the return of the security deposit. If Tenant fully complies with all of the terms hereof, the security deposit or any balance thereof shall be returned to Tenant within thirty (30) days after expiration of this Lease, including any renewal thereof, subject to the provisions of Section 3.4(c) above.

**SECTION 4. USE OF PREMISES**

4.1 Permitted and Prohibited Uses. The Premises shall continuously and at all times during the Term be used and occupied by Tenant only as medical offices for physicians to engage in the private practice of medicine and other related activities incidental thereto (as more particularly identified and limited on Exhibit C attached hereto and incorporated by reference herein) and for no other purpose.

4.2 Compliance with Legal Requirements. Tenant shall act in accordance with and not violate any restrictions, easements, covenants of record, or ground leases (or other leases under which Landlord is the tenant or lessee) affecting the Premises, the Building or the real property on which the Building is located. Tenant shall not use or occupy the Premises in violation of law or of the Certificate of Use or Occupancy issued for the Building of which the Premises are a part, and shall immediately discontinue any use of the Premises which is declared by either any governmental authority having jurisdiction or the Landlord to be a violation of any law, code, regulation or a violation of said Certificate of Use or Occupancy. Tenant shall comply with any direction of any governmental authority having jurisdiction which shall, by reason of the nature of Tenant's use or occupancy of the Premises, impose any duty upon Tenant or Landlord with respect to the Premises or with respect to the use or occupancy thereof.

4.3 Hazardous Acts; Waste; Nuisance. Tenant shall not do nor permit to be done anything which will invalidate or increase the cost of any property and extended coverage insurance policy covering the Building and/or property located therein, and shall comply with all rules, orders, regulations and requirements of the appropriate Fire Rating Bureau or any other organization performing a similar function. Tenant shall promptly upon demand reimburse Landlord for any additional premium charged for such policy by reason of Tenant's failure to comply with the provisions of this paragraph. Tenant shall not do nor permit anything to be done in, on or about the Premises which would in any way obstruct or interfere with the rights of other tenants or occupants of the Building, or use or allow the Premises to be used for any immoral, unlawful or objectionable purpose, nor shall Tenant maintain or permit any nuisance or commit or suffer to be committed any waste in, on or about the Premises.

**SECTION 5. BUILDING SERVICES AND MAINTENANCE**

5.1. Landlord's Services. Landlord will provide all of the following utilities and services:

(a) Electricity and water for the Premises, as reasonably necessary for the uses permitted under this Lease, except to the extent those utilities are separately metered or submetered to the Premises;

(b) Heat and air-conditioning as reasonably necessary for Tenant's comfortable use and occupancy of the Premises during normal business hours. The term "normal business hours" shall mean the hours of 8:00 a.m. to 6:00 p.m. Monday through Friday, excluding legal holidays;

(c) Unless the Premises are equipped with a water heater, hot water at those points of supply provided for the general use of Tenant and other tenants of the Building;

(d) General janitorial and cleaning services for the Premises and Common Areas;

(e) Building-standard light bulb replacement in the Premises and Common Areas;

(f) Elevator service during normal business hours, if the Building is equipped with elevator(s);

(g) Exterior window cleaning, cleaning and snow and ice removal services for the parking areas and walk ways serving the Building, to the extent deemed necessary in Landlord's reasonable judgment; and

(h) Normal maintenance and servicing of toilets, sinks and faucets located within the Premises; provided that Landlord shall not be responsible for any repair, maintenance or servicing required on account of misuse of any of the foregoing or the disposal of foreign materials or substances not intended to be disposed in toilets or sinks, all of which shall be the sole responsibility of Tenant.

5.2. Utility Services; Damage to Tenant's Property. If Tenant requires or utilizes more water or electric power than is considered reasonable or normal by Landlord, Landlord may reasonably determine and require Tenant to pay as Additional Rent, the cost incurred as a result of such additional usage ("**Surcharge**"). Tenant agrees to pay at Landlord's request all separately metered or sub-metered utilities required and used by Tenant in the Premises. Landlord may require one or more separate meter(s) or separate sub-meter(s) to be installed or used for any of Tenant's utilities, including but not limited to water and electric power. Landlord reserves the privilege of stopping any or all utility services in case of accident or breakdown, or for the purpose of making alterations, repairs or improvements. Landlord shall not be liable for the failure to furnish or delay in furnishing any or all of such services when same is caused by or is the result of (a) strikes, labor disputes, labor, fuel or material scarcity, or governmental or other lawful regulations or requirements; (b) the failure of any corporation, firm or person with whom the Landlord may contract for any such service, or for any service incident thereto, to furnish any such service; (c) the making of any alterations, repairs or improvements as described in the preceding sentence; (d) any other cause other than the gross negligence of the Landlord; and the failure to furnish any of such services in such event shall not be deemed or construed as an eviction or relieve Tenant from the performance of any of the obligations imposed upon Tenant by this Lease, including its obligation to pay Rent. Landlord shall not be responsible for the failure of any equipment or machinery to function properly on account of any interruption of such services. Tenant shall be solely responsible for and shall promptly pay all charges for telephone, computer, broadcast, and other communication or information services.

5.3. Medical and Hazardous Waste. (a) Notwithstanding the generality of Sections 5.1(d) and 5.1(h), Tenant, at Tenant's sole cost and expense, shall be responsible for medical, special and infectious waste removal for the Premises and the maintenance and storage thereof pending removal, all in accordance with all applicable laws, regulations and orders. Tenant shall not cause or permit the release, storage or disposal of any hazardous substances, wastes or materials, or any medical, special or infectious wastes, on or about the Premises or the Building except in accordance with all applicable laws and as expressly permitted by Landlord, provided that in no event shall Landlord's permission be deemed to be granted if such permission would be in conflict with applicable law. "**Hazardous substances**" as such term is used in this Lease means any hazardous or toxic substance, material or waste, regulated or listed pursuant to any federal, state or local environmental law. Tenant shall comply with all rules and policies set by Landlord, and with all federal, state and local laws, regulations and ordinances which govern the use, storage, handling and disposal of hazardous substances, wastes or materials and medical, special or infectious wastes. Tenant shall indemnify, defend and hold the Landlord Parties (as defined in Section 7.1 below) harmless from and against any claims, expenses, losses, damages, costs or liabilities arising out of or connected with Tenant's failure to comply with the terms of this Section 5.3, which terms shall survive the expiration or earlier termination of this Lease, and Tenant shall pay for the repair of any damage to pipes, plumbing, or other components of the Building caused in whole or in part by hazardous substances at the Premises (or by the disposal of such substances).

(b) Tenant shall not permit undue accumulations of garbage, trash, rubbish or other refuse within the Premises and shall keep all refuse in proper containers until disposal of such refuse. Tenant shall not permit the mixing or disposal of any hazardous substances, wastes or materials or any medical, special or infectious waste with the general office refuse and Landlord shall have no duty or obligation to remove any hazardous substances, wastes or materials or any medical, special or infectious waste from the Premises (except as provided by separate contract as set forth above in Section 5.3(a)). If requested by Landlord, Tenant shall dispose of all waste, garbage and recyclable materials in designated collection areas, in compliance with Landlord's instructions and applicable law. Failure to comply with this can lead to penalties and fines provided for by applicable municipal code or other applicable law. Tenant shall be solely responsible for and shall pay any such penalties or fines resulting from Tenant's failure to comply with this Section 5.3.

5.4 Landlord's Repairs. Except as provided in subparagraph 5.5(b), Landlord shall maintain in good repair the Building, the Common Areas, the mechanical, plumbing and electrical systems of the Premises, the walls, floors, doors, windows and all structural elements of the Premises (excepting window coverings and painting and repair or replacement of floor or wall coverings). Except as otherwise specifically provided in Section 5, Landlord shall have no duty to maintain, repair, clean or service the Premises and Landlord shall not be liable for any actual, consequential or other damages, costs, liabilities or expenses with regard to maintenance, repair, cleaning or service in, about, on or of the Premises.

5.5. Tenant's Repairs. (a) Tenant shall maintain the Premises in good repair and condition and shall make all repairs and replacements and perform all maintenance necessary to keep the Premises in such condition, except to the extent such maintenance, repairs and replacements are to be provided by Landlord pursuant to this Section 5.

(b) In addition, Tenant shall promptly repair, in a good and workmanlike manner, any damage to the Premises or other part of the Building caused by any breach of this agreement to maintain the Premises, any misuse of the Premises or any part thereof, or any willful or negligent act or omission of Tenant, or of any employee, agent or invitee of Tenant. If Tenant fails to do so, Landlord shall have the right to repair any such damage and Tenant shall pay Landlord for the cost of all such repairs, plus, if Tenant does not pay such cost within thirty (30) days of the date the repairs were made, interest at the Interest Rate (as defined in paragraph 20.8).

(c) (i) Tenant, at its sole cost and expense, shall be responsible for any External Equipment (as hereinafter defined) in all respects and for all utility services used in the operation of such External Equipment. Tenant shall ensure that all use of External Equipment is in accordance with all applicable laws, codes, and regulations. Tenant shall maintain the External Equipment in good, safe repair and condition. Tenant shall be solely responsible for satisfying any requirements for governmental licenses or permits required for any External Equipment. Such requirements may include, but may not be limited to, standards for accreditation set by The Joint Commission ("TJC") and local or state healthcare agency requirements. Further, Tenant shall, at its sole cost and expense, promptly repair, in a good and workmanlike manner, to Landlord's reasonable

satisfaction, any damage to the Premises or the Building caused in connection with or related to the External Equipment. If Tenant fails to do so within thirty (30) days after Landlord gives notice, Landlord shall have the right to repair any such damage and Tenant shall pay Landlord for the cost of all such repairs. Any payment or reimbursement due Landlord under this Section 5.5(c) shall, at Landlord's option, accrue interest at the Interest Rate (as hereinafter defined) from the date ten (10) days after such payment is due and payable until such time as paid.

(ii) If any External Equipment or any service provided to the Premises by External Equipment is shared by or is also provided by the External Equipment for the benefit of any other tenants of the Building, Tenant shall not permanently shut down or remove any such shared External Equipment without providing at least ninety (90) days prior written notice to Landlord.

(iii) As used herein, "**External Equipment**" shall include, but shall not be limited to, x-ray equipment, auxiliary or emergency power generating equipment and systems and oxygen and medical gas systems, all cabling, wiring and piping (which Tenant shall remove at Landlord's request), and any facilities or equipment that are not normally or customarily used by a typical tenant of a standard medical office building, which (a) are located in, on or adjacent to the Building or on the land on which the Building is located or are used in connection with the Building or the Premises, and (b) are dedicated to the exclusive use of Tenant or of one or more portions of the Premises, except to the extent such External Equipment is shared with one or more other tenants of the Building. Landlord reserves the right to designate certain equipment as External Equipment in its reasonable discretion from time to time.

(iv) Tenant acknowledges and agrees that any External Equipment it uses shall be installed, used and maintained solely for Tenant's benefit (except to the extent such External Equipment is shared by any other tenants of the Building) and, notwithstanding anything in this Lease seemingly to the contrary, Landlord shall not be liable for any claims, actions, proceedings, costs, expenses, actual, consequential or other damages or other liabilities arising in any way from any External Equipment, including but not limited to the use, misuse, breakdown or interruption of service of same.

**SECTION 6. ALTERATIONS**

6.1 Alterations by Tenant. Tenant may not make any changes, alterations, improvements or additions to the Premises or attach or affix any articles thereto without Landlord's prior written consent, which consent Landlord shall not unreasonably withhold. All alterations, additions, or improvements which may be made upon the Premises by Landlord or Tenant (except unattached trade fixtures and office furniture and equipment owned by Tenant) shall not be removed by Tenant, but shall become and remain the property of Landlord. All alterations, improvements, and additions to the Premises (as permitted by Landlord) shall be done only by Landlord or contractors or mechanics approved by Landlord, and shall be at Tenant's sole expense and at such times and in such manner as Landlord may approve. If Tenant shall make any alterations, improvements or additions to the Premises, Landlord may require Tenant, at the expiration of this Lease, to restore the Premises to substantially the same condition as existed at the commencement of the Term. Any mechanic's or materialman's lien which has been filed against the Premises or the Building arising out of work done for, or materials furnished to or on behalf of Tenant, its contractors or subcontractors shall be discharged, bonded over, or otherwise satisfied by Tenant within ten (10) days after Tenant is notified of the lien. If Tenant fails to discharge, bond over, or otherwise satisfy any such lien, Landlord may do so at Tenant's expense, and the amount expended by Landlord, including reasonable attorneys' fees, shall be paid by Tenant within ten (10) days following Tenant's receipt of a bill from Landlord.

6.2 Construction Insurance. In addition to any other requirements set forth in this Lease, in the event that Tenant makes any alterations affecting the Premises, prior to the commencement of such alterations, Tenant shall provide Landlord with evidence that Tenant carries Builder's All Risk insurance in an amount approved by Landlord covering the construction of such alterations, and such other insurance as Landlord may reasonably require, it being understood and agreed that all of such alterations shall be insured by Tenant immediately upon completion thereof. In addition, Tenant's contractors and subcontractors shall be required to carry (i) Commercial General Liability Insurance in an amount approved by Landlord, with Landlord, and, at Landlord's option, Landlord's property manager and project manager, as additional insureds in an amount approved by Landlord, and otherwise in accordance with the requirements of this Lease, and (ii) workers compensation insurance with a waiver of subrogation in favor of Landlord. Landlord may, in its discretion, require Tenant to obtain a lien and completion bond or some alternate form of security satisfactory to Landlord in an amount sufficient to ensure the lien-free completion of such alterations and naming Landlord as a co-obligee.

**SECTION 7. DAMAGE TO PROPERTY - INJURY TO PERSONS; INSURANCE; INDEMNIFICATION**

7.1 Tenant's Indemnity. Tenant shall indemnify and hold Landlord and its affiliates, successors, assigns, agents, contractors, and other representatives (each, a "**Landlord Party**") harmless from and against any and all claims, losses, costs, damages, liabilities, and expenses arising from: (a) Tenant's use or occupancy of the Premises or the conduct of Tenant's business or profession (including but not limited to any claims losses, costs, damages, liabilities, or expenses arising from or related to Tenant's leased or owned equipment or other property located in, on, or about the Premises or the Building); (b) any willful or negligent acts or omissions of Tenant, or of Tenant's agents, employees, contractors or invitees; or (c) Tenant's breach of or default under this Lease. Tenant shall further indemnify and hold each Landlord Party harmless from and against all costs, attorneys' fees, expenses and liabilities incurred in connection with any such claim or any action or proceeding brought thereon. In case any action or proceeding is brought against a Landlord Party by reason of any such claim, Tenant upon notice from Landlord, shall defend same at Tenant's expense by counsel reasonably satisfactory to the affected Landlord Party. Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause other than Landlord's negligence or intentional misconduct, and Tenant hereby waives all claims in respect thereof against Landlord. No Landlord Party shall be liable to any person or entity for any injury to person or damage to property actually or allegedly caused by any act, omission, or neglect of a Tenant Party or an invitee or licensee of Tenant or by Tenant's breach of this Lease.

7.2 Landlord's Indemnity. Landlord shall indemnify and hold Tenant and its affiliates, successors, assigns, agents, contractors, and other representatives (each, a "**Tenant Party**") harmless from and against any and all claims, losses, costs damages, liabilities, and expenses arising from: any accident or occurrence occurring within the Building (except the Premises) or the Common Areas and facilities, arising out the negligence or willful misconduct of Landlord, or of Landlord's agents, employees, contractors or invitees. Landlord shall and hereby does further indemnify and hold each Tenant Party harmless from and against all costs, attorneys' fees, expenses and liabilities incurred in connection with any such claim or any action or proceeding brought thereon. In case any such claim, action or proceeding is brought against a Tenant Party, Landlord, upon notice from Tenant, shall defend same at Landlord's expense by counsel reasonably satisfactory to the affected Tenant Party.

7.3 Insurance. Tenant shall, throughout the Term at its sole cost and expense, provide and keep in force, with insurance companies with an AM Best rating of A- IX or better, insurance in respect to this Lease and the Premises in the following amounts for any one accident or occurrence: (a) comprehensive general public liability insurance with limits of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate, naming Landlord its property manager and such other parties as Landlord, may reasonably require, as additional insureds using form CG 20 11 01 96 or its equivalent with such coverage being primary and non-contributory to any such insurance maintained by such additional insured parties; (b) property insurance insuring Tenant against loss or damage to its equipment and other personal property in the Premises by fire and all other casualties usually covered under an "all risk" policy of property insurance; and (c) workers' compensation insurance to the extent required under applicable law. All such policies shall contain a waiver of subrogation in favor of all Landlord Parties. Tenant shall furnish the

Landlord with proof of all such insurance prior to any use of such Premises and proof of renewal prior to the expiration of any such policies. In addition, Tenant agrees to provide copies of such insurance policies upon Landlord's reasonable request.

7.4 Waiver of Liability. Neither Landlord nor its agents shall be liable for any damage to property entrusted to employees of the Building, nor for loss of or damage to any property by theft or otherwise, nor for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water or rain which may leak from any part of the Building or from the pipes, appliances or plumbing works therein or from the roof, street or subsurface, or from any other place or resulting from dampness or any other cause whatsoever, unless directly and entirely caused by and due to the negligence of Landlord. Tenant shall give prompt notice to Landlord in case of fire or accidents in the Premises or in the Building or of defects therein or in the fixtures or equipment. Tenant hereby acknowledges that Landlord shall not be liable for any interruption to Tenant's business for any cause whatsoever, and that Tenant shall obtain Business Interruption Insurance coverage should Tenant desire to provide coverage for such risk.

7.5 Limitation of Liability. Notwithstanding any provision hereof seemingly to the contrary, in no event shall Landlord's total liability under this Lease exceed Landlord's interest in the Building. Tenant shall look solely to Landlord's interest in the Building for the satisfaction of any judgment or decree requiring the payment of money by Landlord and no other property or asset of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of such judgment or decree.

**SECTION 8. DAMAGE OR DESTRUCTION**

If the Premises are damaged by fire or other casualty (collectively "**Casualty**"), the damage shall be repaired by and at the expense of Landlord, unless such damage arises from circumstances addressed in Section 7.1, provided such repairs can, in Landlord's opinion, be made within one hundred eighty (180) days after the occurrence of such Casualty without the payment of overtime or other premiums. If such repairs cannot, in Landlord's opinion, be made within one hundred eighty (180) days, Landlord may, at its option, make them within a reasonable time, and in such event this Lease shall continue in effect. Landlord's election to make such repairs must be evidenced by written notice to Tenant within sixty (60) days after the occurrence of the damage. If Landlord does not so elect to make such repairs which cannot be made within one hundred eighty (180) days, then either party may, by written notice to the other, cancel this Lease as of the date of the Casualty. In the event Landlord makes such repairs, then until such repairs are completed, the Rent shall be abated in proportion to the part of the Premises which is unusable by Tenant in the conduct of Tenant's practice of medicine. However, there shall be no abatement of Rent if the Casualty is due to the negligent acts or omissions of Tenant or Tenant's employees or contractors. A total destruction of the Building in which the Premises are located shall automatically terminate this Lease.

**SECTION 9. EMINENT DOMAIN**

If the Building, the Premises or a material part of either shall be taken by any authorized entity by eminent domain or by negotiated purchase under threat thereof, so that the Premises shall become totally untenantable, this Lease shall terminate as of the earlier of the date when title or possession thereof is acquired or taken by the condemning authority and all rights of Tenant in this Lease shall immediately cease and terminate. If a part of the Building or a portion of the Premises shall be taken such that the Premises becomes only partially untenantable, Base Rent shall be proportionately abated. All compensation awarded for any taking (or the proceeds of negotiated sale under threat thereof) whether for the whole or a part of the Building or the Premises, shall be the property of Landlord, whether such proceeds or award is compensation for loss or damage to Landlord's or Tenant's property or their respective interests in the Premises, the Tenant hereby assigns all of its interest in any such award to Landlord. However, nothing contained herein shall be deemed to give Landlord any interest in or require Tenant to assign to Landlord any separate award expressly made to Tenant for: (a) the taking of personal property and fixtures belonging to Tenant; (b) the interruption of or damage to Tenant's business or profession; (c) the cost of relocation expenses incurred by Tenant; and (d) Tenant's unamortized cost of leasehold improvements; provided that the making of any such award to Tenant shall not reduce or diminish Landlord's award relating to such condemnation. Landlord may without any obligation or liability to Tenant stipulate with any condemning authority for a judgment of condemnation without the necessity of a formal suit or judgment of condemnation, and the date of taking under this clause shall then be deemed the date agreed to under the terms of said agreement or stipulation.

**SECTION 10. ASSIGNMENT AND SUBLETTING BY TENANT**

Tenant shall not, either voluntarily or by operation of law, directly or indirectly, sell, assign, hypothecate, mortgage or transfer this Lease, in whole or in part, or sublet the Premises or any part thereof, or permit the Premises or any part thereof to be occupied by any person, corporation, partnership, or other entity except Tenant or Tenant's employees, without the prior written consent of Landlord in each instance, which consent may be given or withheld in Landlord's sole and absolute discretion. A transfer of stock control in Tenant to a entity or entities that do not have stock control on the Commencement Date, if Tenant is a corporation, or the transfer (in aggregate) of a greater than forty-nine percent (49%) beneficial ownership interest in Tenant subsequent to the Commencement Date, if Tenant is a partnership or other entity, shall be deemed an act of assignment hereunder. In addition, any such subletting or assignment transaction shall be in all respects in compliance with the applicable provisions of the Medicare Anti Kick-Back Law, 42 USC 1320a-7(b)(1) and (2) and the Stark Self-Referral Prohibition Act, 42 USC 1395nn et. seq., as the same may be modified, supplemented or replaced from time to time, and all regulations promulgated thereunder from time to time. Any sale, assignment, mortgage, transfer or subletting of this Lease or the Premises which is not in compliance with the provisions of this Section 10 shall be void. The consent by Landlord to any assignment or subletting shall not be construed as relieving Tenant from obtaining the express prior written consent of Landlord to any further assignment or subletting or as releasing Tenant from any liability or obligation hereunder, whether or not then accrued. Should Landlord permit any assignment or subletting by Tenant and should the moneys received as a result of such assignment or subletting (when compared to the moneys still payable by Tenant to Landlord) be greater than would have been received hereunder had not Landlord permitted such assignment or subletting, then the excess shall be payable by Tenant to Landlord, it being the parties' intention that Landlord, and not Tenant, shall be the party to receive any profit from any assignment or subletting. In the event of any assignment or subletting approved by Landlord, the assignee or sublessee shall assume all of Tenant's obligations under this Lease and shall be bound to comply with all the terms and provisions of this Lease and Tenant and such assignee or sublessee shall be jointly and severally liable for the performance of Tenant's covenants under this Lease.

**SECTION 11. ACCEPTANCE OF PREMISES**

If Landlord is unable to deliver possession of the Premises to Tenant by the Commencement Date for reasons (a) other than *force majeure* (as described in Section 20.14) and (b) due to the occurrence or nonoccurrence of one or more factors or events under Landlord's reasonable control, Rent shall abate proportionally to the date on which Landlord notifies Tenant that the Premises are available for occupancy and the expiration date of this Lease shall be extended correspondingly. Rent shall not abate for delays beyond Landlord's control. If Landlord is unable to deliver the Premises by the Commencement Date, Tenant shall take possession of the Premises within ten (10) days after receipt of written notice from Landlord that the Premises are available for occupancy. By taking possession of the Premises, Tenant shall be deemed to have accepted the Premises in its "as-is" condition and acknowledged that the Premises are in satisfactory condition and repair. Landlord shall not be responsible or liable to Tenant for any actual, consequential or other damages or costs, including but not limited to lost profits, storage costs, moving expenses or any other costs and expenses incurred or suffered by Tenant by reason of Landlord being unable to deliver possession of the Premises to Tenant by the Commencement Date. Landlord will not perform any work with regard to the Premises in preparation for Tenant's occupancy of the Premises, except as follows: None.

**SECTION 12. DEFAULTS**

12.1. Events of Default. The occurrence of any of the following shall constitute a material default and breach of the Lease:

(a) The vacating or abandonment of the Premises by Tenant.

(b) A failure by Tenant to pay Rent or to make any other payment required to be made by Tenant hereunder within ten (10) days after same is due and payable.

(c) A failure to maintain the insurance required pursuant to Section 7 of this Lease.

(d) A violation of the terms of Section 4, Section 5.3, Section 10 or Section 16 of this Lease.

(e) A failure to provide any declaration, document or instrument required pursuant to Section 18 of this Lease within the time period set forth in such Section.

(f) A failure by Tenant to observe and perform any other obligation under this Lease to be observed or performed by Tenant, other than payment of any Rent, within thirty (30) days after written notice by Landlord to Tenant specifying wherein Tenant has failed to perform such obligation; provided, however, that if the nature of Tenant's obligation is such that more than 30 days are required for its performance, then Tenant shall not be deemed to be in default if it shall commence such performance within such 30-day period and thereafter diligently prosecute the same to completion by not later than 90 days after Tenant receives Landlord's written notice.

12.2 Landlord's Default. Landlord shall not be deemed to be in default in the performance of any obligation required to be performed by it hereunder unless and until it has failed to perform such obligation within thirty (30) days after written notice by Tenant to Landlord specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed to be in default if it shall commence such performance within such thirty (30) day period and diligently prosecute the same to completion. In the event of a default by Landlord, Tenant shall be entitled to pursue all rights and remedies available to it under applicable law or in equity.

12.3 Cross-Default. If Tenant (i) fails to pay any amount due on the due date or within any applicable grace period, under any lease or agreement to which it (or any of its affiliates) and Landlord (or any of Landlord's affiliates) are parties (any such lease or agreement, including this Lease, a "Related Agreement"); or (ii) defaults under any other term or condition of any Related Agreement(s), then Landlord may declare an event of default under all such Related Agreements and exercise its rights and remedies thereunder.

**SECTION 13. REMEDIES**

13.1 Remedies. In the event an event of default occurs on the part of Tenant as set forth in Section 12, Landlord may exercise one or more of the following described remedies, in addition to all other rights and remedies available at law or in equity, whether or not stated in this Lease:

(a) Upon the occurrence of an event of default on Tenant's part as set forth in Section 12, Landlord may continue this Lease in full force and effect and shall have the right to collect Rent when due, and Landlord may re-enter the Premises with or without legal process and relet them, or any part of them, to third parties for Tenant's account, and Tenant hereby expressly waives any and all claims for damages by reason of such re-entry. Tenant shall be liable immediately to Landlord for all costs Landlord incurs in reletting the Premises, including, without limitation, brokers' commissions, expenses of remodeling the Premises required by the reletting, attorneys' fees and costs and like costs. Reletting can be for a period shorter or longer than the remaining Term of this Lease, and in no event shall Landlord be under any obligation to relet the Premises. On the dates such rent is due, Tenant shall pay to Landlord a sum equal to the Rent due under this Lease, less the rent Landlord receives from any reletting. No act by Landlord allowed by this paragraph shall terminate the Lease unless Landlord notifies Tenant in writing that Landlord elects to terminate the Lease.

(b) At any time after the occurrence of an event of default by Tenant as described in Section 12, Landlord may terminate Tenant's right to possess the Premises without terminating the Lease. Upon termination of Tenant's right to possess, Landlord shall have the right to collect an amount equal to: all expenses incurred by Landlord in recovering possession of the Premises, including but not limited to reasonable attorneys' fees and costs; all reasonable costs and charges for the care of the Premises while vacant; all renovation costs incurred in connection with the preparation of the Premises for a new tenant; all unreimbursed tenant improvement costs related to the Lease; all past due Rent which is unpaid, plus interest thereon at the Interest Rate (as defined in Section 20.8); and the amount of Rent that would have been due for the remainder of the Term if the Tenant's possession of the Premises continued until the expiration of the Term.

(c) At any time after the occurrence of an event of default by Tenant as described in Section 12, Landlord may terminate this Lease. Upon termination, Landlord shall have the right to collect an amount equal to: all expenses incurred by Landlord in recovering possession of the Premises, including but not limited to reasonable attorneys' fees and costs; all reasonable costs and charges for the care of the Premises while vacant; all renovation costs incurred in connection with the preparation of the Premises for a new tenant; all unreimbursed tenant improvement costs related to the Lease; all past due Rent which is unpaid, plus interest thereon at the Interest Rate (as defined in Section 20.8); and the amount of Rent that would have been due for the remainder of the Term if the Lease had continued until the expiration of the Term.

(d) In the event Landlord engages third parties to collect amounts owed by Tenant or to cure any non-monetary defaults by Tenant, any and all fees charged by such third parties, including but not limited to attorneys' fees, collection agency fees, court or legal costs and other expenses incurred shall be due and payable by Tenant to Landlord.

13.2 Additional Remedies. Should any of these remedies not be permitted by the laws of the state in which the Building is located, then such remedy shall be considered deleted and unenforceable, and the remaining remedies shall remain in full force and effect. Landlord may avail itself of these as well as any other remedies or damages allowed by law, including but not limited to a statutory landlord's lien on personal property in the Premises where applicable and available. All rights, options and remedies of Landlord provided herein or elsewhere by law or in equity shall be deemed cumulative and not exclusive of one another.

**SECTION 14. RULES AND REGULATIONS**

Tenant shall observe faithfully and comply strictly with the Rules and Regulations set forth on Exhibit D attached to this Lease and made a part hereof, and such other rules and regulations as Landlord may from time to time reasonably adopt regarding the Building. Landlord shall not be liable to Tenant for violation of any such Rules and Regulations, or for the breach of any

covenant or condition in any lease by any other tenant in the Building. By the signing of this Lease, Tenant acknowledges that Tenant has read and has agreed to comply with such Rules and Regulations.

**SECTION 15. RIGHT OF ACCESS**

Upon reasonable notice to Tenant, Landlord and its agents shall have free access to the Premises during all reasonable hours (provided, however, Landlord shall have no obligation as a result of access or inspection conducted under this paragraph to make any repairs other than as expressly set forth herein), (i) for the purpose of inspecting, maintaining, installing, constructing, removing or repairing any pipes, ducts, conduits, wiring, supports, improvements, systems, components or other items as Landlord may deem necessary or desirable, regardless of whether such items serve the Premises and/or other portions of the Building and whether such work is to be done within, adjacent to, above, or below the Premises, and (ii) to exhibit the Premises to prospective purchasers, lenders or tenants. Landlord and its agents shall have access to the Premises at any time without prior notice in the event of an emergency. Landlord shall use reasonable efforts to minimize any disruption to Tenant's business in exercise of Landlord's rights under this Section 15.

**SECTION 16. END OF TERM**

16.1 Surrender of Premises. At the termination or expiration of the Term of this Lease, Tenant shall surrender the Premises to Landlord in as good condition and repair as at the Commencement Date, reasonable wear and tear excepted, and will leave the Premises broom-clean. If not then in default, Tenant shall have the right prior to said termination to remove any equipment, furniture, trade fixtures or other personal property placed in the Premises by Tenant, provided that Tenant promptly repairs any damage to the Premises caused by such removal.

16.2 Holdover. In the event Tenant holds over after the expiration or earlier termination of this Lease, such holding over shall thereafter constitute a tenancy at will terminable at any time by Landlord or Tenant giving written notice to the other. Such holding over shall be on all of the same terms and conditions as this Lease (other than the duration of the term and the amount of Rent) and Tenant shall pay Landlord Rent for the period of its hold over at the times for payment specified herein, which Rent shall be 150% of the amount in effect immediately prior to the expiration of this Lease.

**SECTION 17. ASSIGNMENT OR OTHER TRANSFER OF LANDLORD'S INTEREST**

Landlord may freely assign, sell or otherwise transfer the Premises or this Lease, or Landlord's interest hereunder, without Tenant's consent. In the event of any transfer or transfers of Landlord's interest in the Premises or in the real property of which the Premises are a part, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer.

**SECTION 18. ESTOPPEL CERTIFICATE, ATTORNMENT, AND NON-DISTURBANCE**

18.1 Estoppel Certificate. Within ten (10) days following receipt of Landlord's written request, Tenant shall deliver, executed in recordable form, a declaration to any person designated by Landlord: (a) ratifying this Lease; (b) stating the commencement and termination dates of the Lease; and (c) certifying (i) that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be stated); (ii) that all conditions under this Lease to be performed by Landlord have been satisfied (stating exceptions, if any); (iii) that no defenses, credits or offsets against the enforcement of this Lease by Landlord exist (or stating those claimed); (iv) the sum of advance Rent, if any, paid by Tenant; (v) the date to which Rent has been paid; (vi) the amount of security deposited with Landlord; and (vii) such other information as Landlord reasonably requires. Persons receiving such statements of Tenant shall be entitled to rely upon them.

18.2 Sale of Landlord's Interest. In the event of the sale or assignment of Landlord's interest in the Premises or the Building or if the holder of any existing or future mortgage, deed to secure debt, deed of trust, or the lessor under any existing or future underlying lease pursuant to which Landlord is the lessee, shall hereafter succeed to the rights of Landlord under this Lease, then at the option of such successor, Tenant shall attorn to and recognize such successor as Tenant's landlord under this Lease, and shall promptly execute and deliver any instrument that may be necessary to evidence such attornment. If any such successor requests such attornment, this Lease shall continue in full force and effect as a direct lease between such successor, as Landlord, and Tenant, subject to all of the terms, covenants and conditions of this Lease, regardless of whether Tenant executes and delivers the instrument requested by such successor landlord.

18.3 Subordination. This Lease shall be subject to and subordinate and inferior at all times to the lien of any mortgage, to the lien of any deed of trust or other method of financing or refinancing now or hereafter existing against all or a part of the real property upon which the Building is located, and to any existing or future lease by which Landlord leases the Building and/or the ground upon which the Building is located (in which latter instance this Lease is a sublease), and to all renewals, modifications, replacements, consolidations and extensions of any of the foregoing. Tenant shall execute and deliver all documents requested by any mortgagee, security holder or lessor to effect such subordination. If Tenant fails to execute and deliver any such document requested by a mortgagee, security holder or lessor to effect such subordination, Landlord is hereby authorized to execute such documents and take such other reasonable steps as are necessary to effect such subordination on behalf of Tenant as Tenant's duly authorized irrevocable agent and attorney-in-fact, it being agreed that such power is one coupled with an interest. Tenant's failure to execute and deliver such documents or instruments provided for in this Section 18 within fourteen (14) days after the receipt by Tenant of a written request shall constitute a default under this Lease.

**SECTION 19. NOTICES**

(a) Any notice required or permitted to be given hereunder shall be in writing and may be given by: (i) hand delivery and shall be deemed given on the date of delivery; (ii) registered or certified mail and shall be deemed given the third day following the date of mailing; (iii) overnight delivery and shall be deemed given the following day; or (iv) confirmed facsimile transmission and shall be deemed given on the date of the facsimile confirmation.

(b) All notices to Tenant shall be addressed to Tenant at the Building of which the Premises are a part and to Landlord as follows (or to any other address that Landlord shall designate in writing):

HCP MOP Fairfax VA, LP
3000 Meridian Boulevard, Suite 200
Franklin, Tennessee 37067
Attention: Asset Manager

And to the property manager at:

Holladay Property Services Midwest, Inc., d/b/a Holladay Properties
P.O. Box 291686
Nashville, Tennessee 37229-1686

Attention: Property Manager

**SECTION 20. MISCELLANEOUS PROVISIONS**

20.1 Time of Essence. Time is of the essence with respect to the performance of every provision of this Lease.

20.2 Headings; Certain Definitions. The Section and paragraph captions contained in this Lease are for convenience only and shall not be considered in the construction or interpretation of any provision hereof. The word "Term" as used herein, shall be deemed to include, where applicable, any extended or renewal term. The word "Landlord" means the owner of the Building from time to time, and in the event of any sale, conveyance or lease of the Building, the Landlord shall be released from all covenants and conditions as Landlord hereunder and without further agreement between the parties, the purchaser, lessee or other transferee of the Building shall be deemed to have assumed all covenants and conditions of Landlord hereunder. No consent of Tenant shall be required in the event of any such sale, conveyance or lease of the Building which is made subject to this Lease, or to any sale or conveyance of the Building pursuant to which Landlord leases the Building back from such purchaser or other transferee, in which case this Lease shall remain in full force and effect as a sublease between Landlord, as sublessor and Tenant, as sublessee.

20.3 Incorporation of Prior Agreements; Amendments. This Lease and the Exhibits and Amendments attached hereto and incorporated herein contain all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose. No provision of this Lease may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successors in interest.

20.4 Waiver of Subrogation. Landlord and Tenant hereby mutually waive any and all rights of recovery against one another based upon the negligence of either Landlord or Tenant or their agents or employees for real or personal property loss or damage occurring to the Premises or to the Building or any part thereof or any personal property located therein from perils which are able to be insured against in standard fire and extended coverage, vandalism and malicious mischief and sprinkler leakage insurance contracts (commonly referred to as "All Risk"), whether or not such insurance is actually carried. If either party's insurance policies do not permit this waiver of subrogation, then such party will obtain such a waiver from its insurer at its sole expense.

20.5 Waiver. No waiver by Landlord or Tenant of any breach or default of any term, agreement, covenant or condition of this Lease shall be deemed to be a waiver of any other term, agreement, covenant or condition hereof or of any subsequent breach by Landlord or Tenant of the same or any other term, agreement, covenant or condition. Landlord's consent to or approval of any act by Tenant requiring Landlord's consent or approval shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act of Tenant, whether or not similar to the act so consented to or approved. No act or thing done by Landlord or Landlord's agents during the Term of this Lease shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such a surrender shall be valid unless in writing and signed by Landlord. The subsequent acceptance of any Rent, in whole or in part, shall not be deemed a waiver of any preceding breach by Tenant of any agreement, covenant or obligation of Tenant or any other term or condition of this Lease. No delay in billing or any failure to bill Tenant for any Rent, nor any inaccurate billing of Rent shall constitute a waiver by Landlord of its right to collect and to enforce Tenant's obligation to pay the full amount of Rent due and payable under this Lease, as the same may be adjusted or increased from time to time. For the avoidance of doubt, all waivers shall be in writing and signed by the waiving party.

20.6 Accord and Satisfaction. No payment by Tenant or receipt by Landlord of an amount less than is due hereunder shall be deemed to be other than payment towards or on account of the earliest portion of the amount then due by Tenant nor shall any endorsement or statement on any check or payment (or in any letter accompanying any check or payment) be deemed an accord and satisfaction (or payment in full), and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such amount or pursue any other remedy provided herein.

20.7 Quiet Enjoyment. Landlord shall warrant and defend Tenant in the quiet enjoyment and possession of the Premises throughout the Term, subject to the terms, conditions and limitations set forth in this Lease.

20.8 Late Charge. If any monthly installment of Base Rent or Tenant's Proportionate Share of Excess Operating Costs or any payment of Additional Rent is not paid within ten (10) days after such installment or payment is due and payable (the "**Late Payment Date**"), Tenant shall, upon demand, pay Landlord a late charge of 5% of the amount of such installment or payment (or, if less, a charge in the maximum amount permitted under applicable law). In addition, if any such past due installment of Base Rent or Tenant's Proportionate Share of Excess Operating Costs or payment of Additional Rent is not paid within the 30 day period following the Late Payment Date or within any subsequent 30 day period, such past due installment or payment shall, at Landlord's discretion, be subject to an additional late charge in the same amount for each such 30 day period until paid. Such late charge is to defray the administrative costs and inconvenience and other expenses which Landlord will incur on account of such delinquency. Any amounts payable to Landlord under this Lease, if not paid in full on or before the due date thereof, shall, at Landlord's discretion, bear interest on the unpaid balance at the rate of interest (the "**Interest Rate**") equal to the prime rate of interest as published by The Wall Street Journal from time to time, plus 4% per annum (or, if lower, the maximum rate permitted under applicable law), with each change in such prime rate being effective on the date such change is published.

20.9 Binding Effect. This Lease shall be binding upon, and inure to the benefit of the parties hereto, their heirs, successors, assigns, executors and administrators. However, nothing in this Section shall be deemed to amend the provisions of Section 10 on Assignment and Subletting.

20.10. Radon Gas. (**Applicable in Florida only**) Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from the local county public health unit.

20.11 Governing Law. This Lease (and any agreement formed pursuant to the terms hereof, shall be governed by, and construed and enforced in accordance with, the internal laws of the state in which the Building is located (without regard of principles or conflicts of law) and any applicable laws of the United States of America.

20.12 Regulatory Matters.

(a) Landlord and Tenant enter into this Lease with the intent of conducting their relationship and implementing the agreements contained herein in full compliance with applicable federal, state and local law, including without limitation, the Medicare/Medicaid Anti-Kickback statute (the "**Anti-Kickback Law**") and Section 1877 of the Social Security Act (the "**Stark Law**"), as amended. Notwithstanding any unanticipated effect of any of the provisions of this Lease, neither party will intentionally conduct itself under the terms of this Lease in a manner that would constitute a violation of the Anti-Kickback Law or the Stark Law. Without limiting the generality of the foregoing, Landlord and Tenant expressly agree that nothing contained in this Lease shall require either party to refer any patients to the other, or to any affiliate or subsidiary of the other.

(b) If any legislation, regulation or government policy is passed or adopted, the effect of which would cause either party to be in violation of such laws due to the existence of any provision of this Lease, then Landlord and Tenant agree to negotiate in good faith for a period of 90 days to modify the terms of this Lease to comply with applicable law. Should the parties hereto fail to agree upon modified terms to this Lease within this time, either Landlord or Tenant may immediately terminate this Agreement by giving written notice to the other party.

20.13 Submission of Lease. Submission of this Lease to Tenant does not constitute an offer to lease; this Lease shall become effective only upon execution and delivery thereof by Landlord and Tenant.

20.14 Force Majeure. In the event Landlord or Tenant shall be delayed, hindered in or prevented from the performance of any act required hereunder other than the payment of money by reason of strikes, lockouts, labor disputes, inability to procure materials, failure of power, unavailability of any utility service, restrictive governmental laws or regulations, riots, insurrections, the act, failure to act, or default of another party, war, or other reason beyond such party's control, then performance of such act shall be excused for the period of the delay, and the period of performance of any such act shall be extended for a period equivalent to the period of such delay.

20.15 Landlord's Right to Relocate Premises. Landlord shall have the right at any time to require Tenant to surrender the Premises and accept substitute premises (the "**New Premises**") in (i) the Building, or (ii) another building on the same hospital campus as the Building (a building described in the foregoing subsection (ii) a "**New Building**"); provided the following conditions are met: (a) the New Premises shall be comparable in size, configuration and utility to the Premises and shall be reasonably acceptable to Tenant; (b) Landlord will, at Landlord's sole cost and expense, prepare the New Premises to as nearly the same condition as the Premises as is practical under the circumstances, exclusive of Tenant's equipment, External Equipment, trade fixtures, furnishings and personal property; (c) Landlord will pay all reasonable costs (the amount of which shall be agreed upon in advance by Landlord and Tenant) that Tenant incurs in effecting such relocation, including, without limitation, costs of licenses, permits, utility deposits, moving costs, installation of telecommunication and computer lines, and printing costs for new stationery, to the end that Tenant may move into the New Premises without incurring additional costs on account thereof; and (d) Landlord will give Tenant not less than ninety (90) days notice of Landlord's intention to exercise its right under this provision. The physical move to the New Premises shall take place during non-business hours, if reasonably possible, or during such other period as shall be mutually agreed upon by Landlord and Tenant. Rent shall abate for any period during which Tenant's offices must be closed to the public as a result of the relocation. If the New Premises are smaller or larger than the Premises, Rent for the New Premises shall, from the first day Tenant is open for business in the New Premises, be based on the rentable square feet of floor space contained in the New Premises and, if applicable, the New Building. All other charges and amounts payable by Tenant under the Lease based on size of the Premises shall likewise be based on such revised rentable square foot figure. The parties shall execute an amendment to this Lease describing the relocation of Tenant to the New Premises, a description of the New Premises, and the modifications in Rent, if any, and other changes within thirty (30) days after the date of Tenant's relocation to the New Premises. The New Premises shall become the Premises under this Lease and, in the event the Premises are relocated to a New Building, the New Building shall become the Building under this Lease. Tenant agrees to cooperate in good faith with Landlord in accepting New Premises.

20.16 Recordation of Lease. Neither this Lease nor a memorandum of this Lease shall be recorded in the public records without the express prior written consent of Landlord, as determined in its sole and absolute discretion.

20.17 Confidentiality. Tenant agrees to keep confidential and not disclose to any other tenant or prospective tenant of the Building (or to any employee, principal, member, or other representative of same) the financial terms of this Lease, including without limitation the rental rate and term and any options and concessions set forth herein, and agrees that Tenant shall be responsible for any damages sustained by Landlord in the event that Tenant breaches its confidentiality obligation.

20.18 No Terrorist Affiliation. Tenant represents, warrants, and covenants that (i) it and its principals are not acting, and will not act, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated and Blocked Person," or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) Tenant and its principals are not engaged, and will not engage, in this transaction, directly or indirectly, on behalf of, or instigating or facilitating, and will not instigate or facilitate, this transaction, directly or indirectly, on behalf of, any such person, group, entity, or nation. Tenant agrees to indemnify, defend, and hold harmless each Landlord Party from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorneys' fees and costs) arising from or related to any breach of the foregoing representation, warranty and covenant. The breach of this representation, warranty and covenant by Tenant shall be grounds for immediate termination of this Lease by Landlord, in addition to and not in lieu of any other remedies to which Landlord may be entitled.

20.19 CASp Disclosure. (**Applicable in California only**) For purposes of Section 1938 of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Project, Building and Premises have not undergone inspection by a Certified Access Specialist (CASp).

As required by Section 1938(e) of the California Civil Code, Landlord hereby states as follows: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." In furtherance of the foregoing, Landlord and Tenant hereby agree as follows: (a) any CASp inspection requested by Tenant shall be conducted, at Tenant's sole cost and expense, by a CASp approved in advance by Landlord; and (b) pursuant to this Section 20.19, Tenant, at its cost, is responsible for making any repairs within the Premises to correct violations of construction-related accessibility standards; and, if anything done by or for Tenant in its use or occupancy of the Premises shall require repairs to the Building (outside the Premises) to correct violations of construction-related accessibility standards, then Tenant shall, at Landlord's option, either perform such repairs at Tenant's sole cost and expense or reimburse Landlord upon demand, as Additional Rent, for the cost to Landlord of performing such repairs.

20.20 Counterparts and Electronic Signature. This Lease may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same Lease. The counterparts of this Lease and all ancillary documents (if any) may be executed and delivered by facsimile or other electronic signature by any of the parties to any other party and the receiving party may rely on the receipt of such document so executed and delivered by facsimile or other electronic means as if the original had been received.

20.21 Representation of Signatory Authority. Each person signing this Lease represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Lease.

**SECTION 21. EXHIBITS**

The following Amendments, Exhibits or other materials are attached to this Lease and made a part hereof: Exhibit A, Legal Description; Exhibit B, Floor Plan; Exhibit C, Approved Services; Exhibit D, Rules and Regulations; Exhibit E, Guaranty; and First Amendment to Base Year Medical Office Building Lease.

JLA 11/2018
BY Preferred

**IN WITNESS WHEREOF**, the parties have duly executed this Lease the day and year first above written.

WITNESS
As to Tenant:

Jeanne C Petr
(Witness Signature)
JEANNE C PETR
(Witness Printed Name)

[signature]
(Witness Signature)
Alexander Lofft
(Witness Printed Name)

TENANT:

Integrated Wellness MD, LLC, a Maryland limited liability company, d/b/a NAVA
(Name)

By: C Douglas Lord MD
(Signature)

Name: C. Douglas Lord, MD

Title: Owner

Date: 1/2/2019

WITNESS
As to Landlord:

Anna J Shuford
(Witness Signature)
Anna J. Shuford
(Witness Printed Name)

Traci M. Landtroop
(Witness Signature)
Traci M. Landtroop
(Witness Printed Name)

LANDLORD:

HCP MOP Fairfax VA, LP, a Delaware limited partnership

By: HCP MOP A Pack GP, LLC, its general partner
(Name)

By: [signature]
(Signature)

Name: Christian E. Weber

Title: Vice President

Date: 1/9/19

JLA 11/2018
BY Preferred

**EXHIBIT A TO BASE YEAR MEDICAL OFFICE BUILDING LEASE**

**LEGAL DESCRIPTION**

**PARCEL "A"**

**All of Parcel "A, Yorktown 50 Center as shown on a plat entitled "Plat of Subdivision, Vacation and Dedication of Various Easements of Parcels "A" and ""B" Yorktown 50 Center" dated October 18, 2002 and prepared by VIKA, Inc. as recorded in Deed Book 14677 at Page 1592 in the Land Records of Fairfax County, Virginia.**

**Together with easements benefiting Parcel "A" as set forth in Declaration of Easements, Covenants, Restrictions and Agreements dated July 29, 2003, and recorded in Deed Book 14908, at Page 1535 in the Land Records of Fairfax County, Virginia.**

**And Being part of the property conveyed in Deed Book 10736 at Page 1777 among the said Land Records.**

**Tax I.D. No. 049-3-22-0002-C**

**PARCEL "B"**

**All of Parcel "B", Yorktown 50 Center as shown on a plat entitled "Plat of Subdivision, Vacation and Dedication of Various Easements of Parcels "A" and "B" Yorktown 50 Center" dated October 18, 2002 and prepared by VIKA, Inc. as recorded in Deed Book 14677 at Page 1592 in the Land Records of Fairfax County, Virginia.**

**Together with easements benefiting Parcel "B" as set forth in Declaration of Easements, Covenants, Restrictions and Agreements dated July 29, 2003, and recorded in Deed Book 14908, at Page 1535 in the Land Records of Fairfax County, Virginia.**

**And Being the same property conveyed by Deed Book 14908 at Page 1559 among the Land Records of Fairfax County, Virginia.**

JLA 11/2018
BY Preferred

**EXHIBIT B TO BASE YEAR MEDICAL OFFICE BUILDING LEASE**

**FLOOR PLAN**

**See Attached.**




EXISTING FLOOR PLAN FOR:

YORKTOWN 50 M.O.B.
8316 ARLINGTON BLVD., SUITE 206
FAIRFAX, VIRGINIA

Project: -

Scale: 1/8" = 1'-0"
Drawn: AMK
Checked:
Date: 1/18/18

Sheet:
E1.1

From:

architecture incorporated
1902 campus commons drive
suite 101
reston, virginia 20191
tel: 703-476-3900
fax: 703-264-0733
www.archinc.com

JLA 11/2018
BY Preferred

**EXHIBIT C TO BASE YEAR MEDICAL OFFICE BUILDING LEASE**

**APPROVED SERVICES**

The undersigned hereby acknowledge and agree that the undersigned Tenant may conduct the following Approved Services on the Premises during the Term of the Lease:

**medical office**

All capitalized terms not defined in this Exhibit C shall have the meanings assigned to such terms in that certain Medical Office Building Lease entered into and effective as of Jan. 9, 2019, by and between the undersigned Tenant and HCP MOP Fairfax VA, LP, a Delaware limited partnership, or its assigns, as Landlord. This Exhibit C is incorporated by reference into such Lease as if fully set forth therein.

**IN WITNESS WHEREOF**, Tenant, HOSPITAL OWNER/GROUND LESSOR/OTHER APPROVING THIRD PARTY (if applicable) and Landlord have duly executed this Exhibit C as of the 9th day of January, 2019.

TENANT:

Integrated Wellness MD, LLC, a Maryland limited liability company, d/b/a NAVA
(Name)

By: [signature]
(Signature)

Print Name: C. Douglas Lord, MD

Title: Owner

Date: 1/2/2019

HOSPITAL OWNER/GROUND LESSOR/OTHER APPROVING THIRD PARTY:

N/A
(Name)

By: ____________________
(Signature)

Print Name: ____________________

Title: ____________________

Date: ____________________

LANDLORD:

HCP MOP Fairfax VA, LP, a Delaware limited partnership

By: HCP MOP A Pack GP, LLC, its general partner
(Name)

By: [signature]
(Signature)

Print Name: Christian E. Weber

Title: Vice President

Date: 1/9/19

**EXHIBIT D TO BASE YEAR MEDICAL OFFICE BUILDING LEASE**
**RULES AND REGULATIONS**

1. **CONDUCT.** Tenant shall not conduct its practice or business, or advertise such business, profession or activities of Tenant conducted in the Premises in any manner which violates local, state or federal laws or regulations.

2. **HALLWAYS AND STAIRWAYS.** Tenant shall not obstruct or use for storage, or for any purpose other than ingress and egress, the sidewalks, entrance, passages, courts, corridors, vestibules, halls, elevators and stairways of the Building.

3. **NUISANCES.** Tenant shall not make or permit any noise, vibration, odor or act that is objectionable to other occupants of the Building to emanate from the Premises, and shall not create or maintain a nuisance thereon.

4. **MUSICAL INSTRUMENTS, ETC**. Tenant shall not install or operate any phonograph, musical instrument, radio receiver or similar device in the Building in such manner as to disturb or annoy other tenants of the Building or the neighborhood. Tenant shall not install any antennae, aerial wires or other equipment outside the Building without the prior written approval of Landlord.

5. **LOCKS.** With the exception of Tenant's pharmaceuticals locker or storage facility, no additional locks or bolts of any kind shall be placed upon any of the doors or windows by Tenant, nor shall any changes be made in existing locks or the mechanism thereof. Tenant must upon the termination of its tenancy restore to Landlord all keys to the Premises and toilet rooms either furnished to or otherwise procured by Tenant, and in the event of loss of any keys so furnished, Tenant shall pay to Landlord the cost thereof.

6. **OBSTRUCTING LIGHT, DAMAGE.** The sash doors, sashes window glass doors, lights and skylights that reflect or admit light into the halls or other places of the Building shall not be covered or obstructed. The toilets and urinals shall not be used for any purpose other than those for which they were intended and constructed, and no rubbish, newspapers or other substance of any kind shall be thrown into them. Waste and excessive or unusual use of water shall not be allowed. Tenant shall not mark, drive nails, screw or drill into, paint, nor in any way deface the walls, ceilings, partitions, floors, wood, stone or iron work. The expense of any breakage, stoppage or damage resulting from a violation of this rule by Tenant shall be borne by Tenant. Tenant shall be permitted to hang pictures on office walls, but it must be done in a workmanlike manner and in such a way as not to damage or deface such walls.

7. **WIRING.** Electrical wiring of every kind shall be introduced and connected only as directed by Landlord, and no boring nor cutting of wires will be allowed except with the consent of Landlord. The location of the telephone, call boxes, etc., shall be subject to the approval of Landlord.

8. **EQUIPMENT, MOVING, FURNITURE, ETC**. Landlord shall approve the weight, size and position of all fixtures, equipment and other property brought into the Building, and the times of moving which must be done under the supervision of Landlord. Landlord will not be responsible for any loss of or damage to any such equipment or property from any cause, and all damage done in the Building by moving or maintaining any such property shall be repaired at the expense of Tenant. All equipment shall be installed as required by law, and in accordance with and subject to written approval received on written application of Tenant.

9. **REQUIREMENTS OF TENANT.** The requirements of Tenant will be attended to only upon application at the office of Landlord or its Property Manager. Employees of Landlord or its Property Manager shall not perform any work nor do anything outside their regular duties unless under special instructions from Landlord or its Property Manager. No such employees shall admit any person, Tenant or otherwise, to any other office without instruction from the office of Landlord or its Property Manager. All janitorial services personnel, guards or any outside contractors employed by Tenant shall be subject to the regulations and control of Landlord, but shall not act as an agent or servant of Landlord.

10. **MEDICAL AND HAZARDOUS WASTES.** Tenant shall comply with all policies established from time to time by Landlord regarding the storage and disposal of hazardous substances, wastes and materials, and medical, special or infectious wastes.

11. **ACCESS TO BUILDING.** Any person entering or leaving the Building may be questioned by Building security regarding his/her business in the Building and may be required to sign in and out. Anyone who fails to provide a satisfactory reason for being in the Building may be excluded.

12. **VEHICLES, ANIMALS, REFUSE.** Tenant shall not allow anything to be placed on the outside window ledges of the Premises or to be thrown out of the windows of the Building. No bicycle or other vehicle, and no animal shall be brought into the offices, halls, corridors, elevators or any other parts of the Building by Tenant or the agents, employees or invitees of Tenant, and Tenant shall not place or permit to be placed any obstruction or refuse in any public part of the Building.

13. **EQUIPMENT DEFECTS.** Tenant shall give Landlord prompt notice of any accidents to or defects in the water pipes, gas pipes, electric lights and fixtures, heating apparatus, or any other service equipment.

14. **PARKING.** Unless otherwise specified by Landlord, Tenant and its employees may park automobiles only in spaces designated by Landlord for such purpose and shall in no event park in spaces reserved for public parking or for designated parkers. Tenant agrees that Landlord assumes no responsibility of any kind whatsoever in reference to such automobile parking area or the use thereof by Tenant or its agents or employees.

15. **CONSERVATION AND SECURITY.** Tenant will see that all windows and doors are securely locked, and that all faucets and electric light switches are turned off before leaving the Building.

16. **SIGNAGE.** Tenant shall not place any sign upon the Premises or the Building without Landlord's prior written consent.

17. **VENDING MACHINES.** Tenant shall not place, install, maintain or use any vending machine on the Premises without Landlord's prior written consent.

18. **AIR CONDITIONING AND HEATING UNITS.** No air conditioning or heating unit or other similar apparatus shall be used or installed by any tenant without the prior written consent of Landlord.

JLA 11/2018
BY Preferred

**EXHIBIT E TO BASE YEAR MEDICAL OFFICE BUILDING LEASE**

**GUARANTY**

**N/A**

As a material part of the consideration inducing Landlord to execute this Lease with Tenant, the undersigned, being all of the shareholders, partners, members or owners, as the case may be, of Tenant (who are collectively hereinafter referred to as the "Guarantors"), join in the execution of this Lease as of the date first set forth in the Lease and jointly and severally, do hereby unconditionally guarantee the full performance by Tenant of all obligations, indemnities and agreements to be paid, performed or observed by Tenant under and pursuant to this Lease, including but not limited to the payment of Rent and any and all other sums required to be paid by Tenant hereunder when due. The Guarantors further hereby give and grant to Landlord the rights, power and authority, without notice to or approval of any of them and without in any way prejudicing, impairing or affecting any of the Guarantors' liability hereunder, to alter, extend or otherwise modify this Lease to the extent which may be agreed upon by Landlord and Tenant; to forbear or delay enforcing the payment of Rent or other sums due under the Lease or enforcing any other obligations of Tenant under the Lease; to release any other person liable for Tenant's obligations under the Lease or any other collateral Landlord may hold for the obligations of Tenant under the Lease; to proceed directly against the Guarantors or any of them on this Guaranty whether or not action is brought against Tenant and whether or not Tenant is joined in any such action, without resort to any security which may be held by Landlord, and without first having exhausted the remedies it may have against Tenant.

The Guarantors hereby waive demand and/or notice of any kind including, but not limited to, notice of default or breach on the part of Tenant of any of the provisions of this Lease or notice of the existence, creation or incurring of any new, different, or additional obligation as aforesaid.

This Guaranty is and shall be construed to be an irrevocable, absolute, unlimited and continuing guaranty of payment and performance, and the liability of each Guarantor hereunder and Landlord's right to pursue each Guarantor shall not be affected, delayed, limited, impaired or discharged, in whole or in part, by reason of any extension or discharge that may be granted to the Tenant, whether in proceedings under the Bankruptcy Code or any amendments thereof, or under any other state or other federal statutes, or otherwise. The Guarantor expressly waives the benefits of any extension or discharge granted to Tenant. This Guaranty shall survive notwithstanding the expiration or termination of the Lease and this Guaranty shall survive with respect to any sums previously received from Tenant or from Guarantor that Landlord may be required to repay in any proceeding described in this paragraph.

The Guarantors further agree upon demand to pay Landlord reasonable attorneys' fees and all costs and other expenses incurred by it in collecting or compromising any obligation hereby guaranteed, or in enforcing this Guaranty against the Guarantors.

The Landlord shall have the right, without affecting any Guarantor's obligations hereunder, and without demand or notice, to collect first from the Tenant, and to exercise its rights of setoff against any asset of the Tenant, and to otherwise pursue and collect from the Tenant any other indebtedness of the Tenant to the Landlord not covered by this Guaranty, and any sums received from the Tenant, whether by voluntary payment, offset, or collection efforts, may be applied by the Landlord as it sees fit, including the application of all such amounts to other debts not guaranteed by the Guarantors. Subrogation rights or any other rights of any kind of any Guarantor against the Tenant, if any, shall not become available until all indebtedness and obligations of the Tenant to the Landlord are paid in full. This Guaranty shall survive the expiration or termination of the Lease to the extent the obligations of the Tenant thereunder likewise survive.

| GUARANTORS: | Date: |
|---|---|
| ______________________________ | ________________ |
| ______________________________ | ________________ |
| ______________________________ | ________________ |
| ______________________________ | ________________ |

AMP, GE 9/20/9 BY
NonADCRE form

**FIRST AMENDMENT TO BASE YEAR MEDICAL OFFICE BUILDING LEASE**

This FIRST AMENDMENT TO BASE YEAR MEDICAL OFFICE BUILDING LEASE (this "**Amendment**") is made as of January 9, 2019, by and between HCP MOP Fairfax VA, LP, a Delaware limited liability company, or its assigns ("**Landlord**") and Integrated Wellness MD, LLC, a Maryland limited liability company, d/b/a NAVA ("**Tenant**") under the following circumstances:

Landlord and Tenant are about to enter into that certain Base Year Medical Office Building Lease dated as of January 9, 2019 (the "**Lease**") whereby Landlord will lease to Tenant premises consisting of 2,680 (2,414 usable) rentable square feet and known as Suite No. 206 on the second (2nd) floor of the building located at 8316 Arlington Boulevard, Fairfax, Virginia 22031, which real property is described on Exhibit A to the Lease (the "**Premises**"); and

In order to induce Tenant to execute the Lease, Landlord and Tenant are executing this Amendment in order to modify certain terms of the Lease.

NOW THEREFORE, in consideration of the promises and the agreements and covenants contained herein, Landlord and Tenant agree that the Lease is amended and modified as follows:

**A. Amendments.**

1. Notwithstanding anything in the Lease to the contrary, the Commencement Date shall be the later of (i) the date of full execution of this Lease or (ii) January 1, 2019.

2. Notwithstanding any provision of the Lease to the contrary, Landlord shall allow Tenant to access the Premises upon Tenant execution of this Lease to install Tenant's furniture, fixtures, and equipment (which access shall not require the payment of Base Rent or Operating Costs, but which shall otherwise be on and subject to all of the terms and conditions of this Lease), so long as such pre-Commencement Date access does not interfere with or result in additional costs or delays to Landlord.

3. The following language is hereby inserted at the end of Section 2.1 of the Lease:

> "Notwithstanding the above, Tenant shall not be obligated to pay Base Rent for the months of January 2019 through July 2019 of the initial Term. This Base Rent concession shall total Fifty-Seven Thousand, Eight Hundred Forty-Three and 33/100 Dollars ($57,843.33) (or such other amount as may be applicable due to adjustments under the terms of this Lease) ("**Rent Concession**"). The Rent Concession shall be due and payable by Tenant to Landlord if there occurs an event of monetary default under the Lease on the part of Tenant and such default is not cured within any applicable time frame set forth in this Lease."

4. The words "with written notice," are hereby added following the words "Landlord may require Tenant," in the fourth (4th) sentence of Section 6.1 of the Lease.

5. Section 20.15 of the Lease is hereby deleted in its entirety.

6. The following language is hereby added to the Lease as a new section numbered Section 22:

> **"SECTION 22. TENANT OPTION TO TERMINATE LEASE**
>
> So long as Tenant is not in default, Tenant shall have the right to terminate this Lease effective at the end of the seventh (7th) Lease Year of the initial Term (the "**Early Termination Date**") by providing Landlord with written notice at least six (6) months prior to the Early Termination Date, which notice shall be accompanied by a termination fee equal to (i) the total of any unamortized broker's commissions or fees plus (ii) any unamortized tenant improvement costs incurred in connection with Tenant's occupancy or anticipated occupancy of the Premises, as consideration for such termination (collectively, the "**Termination Fee**"). The Termination Fee shall be paid prior to and as a condition precedent to the effectiveness of such termination. Upon the Early Termination Date, Tenant shall surrender the Premises to Landlord in accordance with Section 16.1 of the Lease, and both parties shall be released of

all obligations and liabilities arising under this Lease, provided that Tenant shall remain liable for all obligations under the Lease which arose prior to termination or are otherwise intended to survive termination (including but not limited to indemnification and accrued Rent obligations). Notwithstanding anything to the contrary set forth herein, the foregoing right to terminate shall not apply to (i) any renewal or extension of the Lease, (ii) any offer to lease, (iii) any new lease entered into with the original tenant under this Lease or with such tenant's successors or assigns, or (iv) any transfer of tenant's interest contemplated under this Lease (including but not limited to assignments)."

7. Except to the extent otherwise expressly provided in the Lease, whenever the approval or consent of either of the parties hereto is required under the Lease, such approval or consent shall not be unreasonably withheld, conditioned or delayed.

**B. Miscellaneous.**

Except as amended by this Amendment, the Lease is not otherwise amended, and the Lease remains in full force and effect, as amended hereby. In the event of a conflict between the terms of this Amendment and the terms of the Lease, the terms of this Amendment shall control. Capitalized terms used in this Amendment but not defined herein shall have the meaning set forth in the Lease.

**[REMAINDER OF PAGE INTENTIONALLY BLANK – SIGNATURES FOLLOW]**

AMP, GE 9/20/9 BY
NonADCRE form

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Amendment as of the date first above written.

**WITNESSES:**

(Witness Signature)
Anna J. Shuford
(Witness Printed Name)

(Witness Signature)
Traci M. Landtroop
(Witness Printed Name)

**LANDLORD:**

HCP MOP Fairfax VA, LP, a Delaware limited partnership

By: HCP MOP A Pack GP, LLC, its general partner

By: ______________________

Name: Christian E. Weber

Title: Vice President

Date: 1/9/19

**WITNESSES:**

(Witness Signature)
JEANNE C PETR
(Witness Printed Name)

(Witness Signature)
Alexander Loffl
(Witness Printed Name)

**TENANT:**

Integrated Wellness MD, LLC, a Maryland limited liability company, d/b/a NAVA

By: ______________________

Name: C. Douglas Lord, MD

Title: Owner

Date: 1/2/2019

# **EXHIBIT "B"**

Tenant: Nava Health Medical Group, LLC (t0004820)
Property: Yorktown 50

| Trans Date | From Date | To Date | Post Month | Charge Code | Description | Unit | Charge | County | City | Payment | Balance | Charge # | Document Sequence | Receivable # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/13/2019 | 1/13/2019 | 1/13/2019 | 05/2025 | SECDEP | Security Deposit converted | 206 | 8,263.33 | 0.00 | 0.00 | 0.00 | 8,263.33 | C-31603 | 31603 | |
| 1/13/2019 | 1/13/2019 | 1/13/2019 | 05/2025 | | | | 0.00 | 0.00 | 0.00 | 8,263.33 | 0.00 | | 770 | R-770 |
| 1/1/2025 | 1/1/2025 | 1/31/2025 | 05/2025 | OPXEST | HO455686 | 206 | 384.43 | 0.00 | 0.00 | 0.00 | 384.43 | C-41277 | 42888 | |
| 1/11/2025 | 1/1/2025 | 1/31/2025 | 05/2025 | RNTLAT | LATE FEE | 206 | 984.82 | 0.00 | 0.00 | 0.00 | 1,369.25 | C-14146 | 8391 | |
| 2/1/2025 | 2/1/2025 | 2/28/2025 | 05/2025 | OPXEST | HO458174 | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 1,807.27 | C-41250 | 42886 | |
| 2/11/2025 | 2/1/2025 | 2/28/2025 | 05/2025 | RNTLAT | LATE FEE | 206 | 1,000.51 | 0.00 | 0.00 | 0.00 | 2,807.78 | C-14147 | 8392 | |
| 2/15/2025 | 2/1/2025 | 2/28/2025 | 05/2025 | OPXPY | FY2024 Recovery Reconciliation | 206 | -1,862.89 | 0.00 | 0.00 | 0.00 | 944.89 | C-14148 | 8393 | |
| 2/15/2025 | 2/1/2025 | 2/28/2025 | 05/2025 | OPXEST | HO457504 | 206 | 53.59 | 0.00 | 0.00 | 0.00 | 998.48 | C-41271 | 42887 | |
| 2/15/2025 | 2/15/2025 | 2/15/2025 | 05/2025 | | Chk# " HO457504 | | 0.00 | 0.00 | 0.00 | 1,314.06 | -315.58 | | 6938 | R-6938 |
| 3/1/2025 | 3/1/2025 | 3/31/2025 | 05/2025 | OPXEST | HO460244 | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 122.44 | C-41317 | 42889 | |
| 3/11/2025 | 3/1/2025 | 3/31/2025 | 05/2025 | RNTLAT | LATE FEE | 206 | 855.45 | 0.00 | 0.00 | 0.00 | 977.89 | C-14149 | 8394 | |
| 4/1/2025 | 4/1/2025 | 4/30/2025 | 05/2025 | RNTBRO | AUTOCHRG @T4/30/2025 | 206 | 6,531.51 | 0.00 | 0.00 | 0.00 | 7,509.40 | C-14371 | 8400 | |
| 4/1/2025 | 4/1/2025 | 4/30/2025 | 05/2025 | OPXEST | AUTOCHRG @T4/30/2025 | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 7,947.42 | C-14372 | 8401 | |
| 4/11/2025 | 4/1/2025 | 4/30/2025 | 05/2025 | RNTLAT | LATE FEE | 206 | 806.21 | 0.00 | 0.00 | 0.00 | 8,753.63 | C-14366 | 8395 | |
| 5/1/2025 | 5/1/2025 | 5/31/2025 | 05/2025 | RNTBRO | AUTOCHRG @T5/31/2025 | 206 | 9,724.03 | 0.00 | 0.00 | 0.00 | 18,477.66 | C-14369 | 8398 | |
| 5/1/2025 | 5/1/2025 | 5/31/2025 | 05/2025 | OPXEST | AUTOCHRG @T5/31/2025 | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 18,915.68 | C-14370 | 8399 | |
| 6/1/2025 | 6/1/2025 | 6/30/2025 | 06/2025 | RNTBRO | AUTOCHRG @T6/30/2025 | 206 | 9,724.03 | 0.00 | 0.00 | 0.00 | 28,639.71 | C-14367 | 8396 | |
| 6/1/2025 | 6/1/2025 | 6/30/2025 | 06/2025 | OPXEST | AUTOCHRG @T6/30/2025 | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 29,077.73 | C-14368 | 8397 | |
| 6/2/2025 | 6/2/2025 | 6/2/2025 | 06/2025 | | Chk# W060225 | | 0.00 | 0.00 | 0.00 | 10,162.05 | 18,915.68 | | 13745 | R-15445 |
| 7/1/2025 | 7/1/2025 | 7/31/2025 | 07/2025 | RNTBRO | Base Rent-Office | 206 | 9,724.03 | 0.00 | 0.00 | 0.00 | 28,639.71 | C-82591 | 73875 | |
| 7/1/2025 | 7/1/2025 | 7/31/2025 | 07/2025 | OPXEST | Recoveries-Operating Exp | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 29,077.73 | C-82592 | 73875 | |
| 7/11/2025 | 7/21/2025 | 7/21/2025 | 07/2025 | RNTLAT | Late Fee | 206 | 1,431.16 | 0.00 | 0.00 | 0.00 | 30,508.89 | C-92480 | 78764 | |
| 7/28/2025 | 7/28/2025 | 7/28/2025 | 07/2025 | | Chk# 9913194639 : Multiple Payer Match - Amount does not match- ACA ctrl#7192 | | 0.00 | 0.00 | 0.00 | 10,162.05 | 20,346.84 | | 27991 | R-31104 |
| 8/1/2025 | 8/1/2025 | 8/31/2025 | 08/2025 | RNTBRO | Base Rent-Office | 206 | 9,724.03 | 0.00 | 0.00 | 0.00 | 30,070.87 | C-91687 | 78084 | |
| 8/1/2025 | 8/1/2025 | 8/31/2025 | 08/2025 | OPXEST | Recoveries-Operating Exp | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 30,508.89 | C-91688 | 78084 | |
| 8/21/2025 | 8/21/2025 | 8/21/2025 | 08/2025 | RNTLAT | 8/25 Late Fee | 206 | 1,271.54 | 0.00 | 0.00 | 0.00 | 31,780.43 | C-114253 | 86666 | |
| 9/1/2025 | 9/1/2025 | 9/30/2025 | 09/2025 | RNTBRO | Base Rent-Office | 206 | 9,724.03 | 0.00 | 0.00 | 0.00 | 41,504.46 | C-113635 | 86167 | |
| 9/1/2025 | 9/1/2025 | 9/30/2025 | 09/2025 | OPXEST | Recoveries-Operating Exp | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 41,942.48 | C-113636 | 86167 | |
| 9/11/2025 | 9/19/2025 | 9/19/2025 | 09/2025 | RNTLAT | Late Fee | 206 | 1,779.64 | 0.00 | 0.00 | 0.00 | 43,722.12 | C-134940 | 95145 | |
| 10/1/2025 | 10/1/2025 | 10/31/2025 | 10/2025 | RNTBRO | Base Rent-Office | 206 | 9,724.03 | 0.00 | 0.00 | 0.00 | 53,446.15 | C-133698 | 94148 | |
| 10/1/2025 | 10/1/2025 | 10/31/2025 | 10/2025 | OPXEST | Recoveries-Operating Exp | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 53,884.17 | C-133699 | 94148 | |
| 10/9/2025 | 10/9/2025 | 10/9/2025 | 10/2025 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,162.05 | 43,722.12 | | 49928 | R-55551 |
| 10/11/2025 | 10/16/2025 | 10/16/2025 | 10/2025 | RNTLAT | Late Fee | 206 | 1,779.64 | 0.00 | 0.00 | 0.00 | 45,501.76 | C-144028 | 98663 | |
| 10/21/2025 | 10/21/2025 | 10/21/2025 | 10/2025 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,184.79 | 35,316.97 | | 51756 | R-57363 |
| 10/23/2025 | 10/23/2025 | 10/23/2025 | 10/2025 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,162.05 | 25,154.92 | | 52296 | R-58146 |
| 11/1/2025 | 11/1/2025 | 11/30/2025 | 11/2025 | RNTBRO | Base Rent-Office | 206 | 9,724.03 | 0.00 | 0.00 | 0.00 | 34,878.95 | C-147826 | 100078 | |
| 11/1/2025 | 11/1/2025 | 11/30/2025 | 11/2025 | OPXEST | Recoveries-Operating Exp | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 35,316.97 | C-147827 | 100078 | |
| 11/11/2025 | 11/11/2025 | 11/11/2025 | 11/2025 | RNTLAT | Late Fee | 206 | 1,524.31 | 0.00 | 0.00 | 0.00 | 36,841.28 | C-160998 | 105443 | |
| 11/28/2025 | 11/28/2025 | 11/28/2025 | 11/2025 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,162.05 | 26,679.23 | | 62967 | R-69225 |
| 12/1/2025 | 12/1/2025 | 12/31/2025 | 12/2025 | RNTBRO | Base Rent-Office | 206 | 9,724.03 | 0.00 | 0.00 | 0.00 | 36,403.26 | C-163813 | 106325 | |
| 12/1/2025 | 12/1/2025 | 12/31/2025 | 12/2025 | OPXEST | Recoveries-Operating Exp | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 36,841.28 | C-163814 | 106325 | |
| 12/15/2025 | 12/15/2025 | 12/15/2025 | 12/2025 | RNTLAT | Late Fee | 206 | 1,524.31 | 0.00 | 0.00 | 0.00 | 38,365.59 | C-177690 | 112473 | |
| 12/19/2025 | 12/19/2025 | 12/19/2025 | 12/2025 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,162.05 | 28,203.54 | | 68764 | R-75107 |
| 1/1/2026 | 1/1/2026 | 1/31/2026 | 01/2026 | RNTBRO | Base Rent-Office | 206 | 9,724.03 | 0.00 | 0.00 | 0.00 | 37,927.57 | C-185398 | 115648 | |
| 1/1/2026 | 1/1/2026 | 1/31/2026 | 01/2026 | OPXEST | Recoveries-Operating Exp :Revised by ctrl# 200716 | 206 | 438.02 | 0.00 | 0.00 | 0.00 | 38,365.59 | C-185399 | 115648 | |
| 1/1/2026 | 1/1/2026 | 1/31/2026 | 01/2026 | OPXEST | Recoveries-Operating Exp | 206 | 435.59 | 0.00 | 0.00 | 0.00 | 38,801.18 | C-200715 | 122175 | |
| 1/1/2026 | 1/1/2026 | 1/31/2026 | 01/2026 | OPXEST | Reversed Recoveries-Operating Exp :Revises charge ctrl# 185399 | 206 | -438.02 | 0.00 | 0.00 | 0.00 | 38,363.16 | C-200716 | 122175 | |
| 1/15/2026 | 1/15/2026 | 1/15/2026 | 01/2026 | RNTLAT | Late Fee | 206 | 1,502.41 | 0.00 | 0.00 | 0.00 | 39,865.57 | C-202208 | 122842 | |
| 1/16/2026 | 1/16/2026 | 1/16/2026 | 01/2026 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,162.05 | 29,703.52 | | 76858 | R-84020 |
| 2/1/2026 | 2/1/2026 | 2/28/2026 | 02/2026 | OPXEST | Recoveries-Operating Exp | 206 | 435.59 | 0.00 | 0.00 | 0.00 | 30,139.11 | C-205544 | 124114 | |
| 2/1/2026 | 2/1/2026 | 2/28/2026 | 02/2026 | RNTBRO | Base Rent-Office | 206 | 9,991.44 | 0.00 | 0.00 | 0.00 | 40,130.55 | C-205545 | 124114 | |
| 2/11/2026 | 2/11/2026 | 2/11/2026 | 02/2026 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,159.62 | 29,970.93 | | 86377 | R-94406 |
| 2/15/2026 | 2/15/2026 | 2/15/2026 | 02/2026 | RNTLAT | Late Fee | 206 | 985.77 | 0.00 | 0.00 | 0.00 | 30,956.70 | C-220249 | 130256 | |
| 3/1/2026 | 3/1/2026 | 3/31/2026 | 03/2026 | OPXEST | Recoveries-Operating Exp | 206 | 435.59 | 0.00 | 0.00 | 0.00 | 31,392.29 | C-224101 | 131347 | |
| 3/1/2026 | 3/1/2026 | 3/31/2026 | 03/2026 | RNTBRO | Base Rent-Office | 206 | 9,991.44 | 0.00 | 0.00 | 0.00 | 41,383.73 | C-224102 | 131347 | |
| 3/9/2026 | 3/9/2026 | 3/9/2026 | 03/2026 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,241.71 | 31,142.02 | | 94722 | R-103193 |
| 3/15/2026 | 1/1/2025 | 12/31/2025 | 02/2026 | OPXPY | 2025 CAM Reconciliation – Operating Expenses [Foundry] | 206 | -185.32 | 0.00 | 0.00 | 0.00 | 30,956.70 | C-225674 | 132486 | |
| 3/15/2026 | 3/15/2026 | 3/15/2026 | 03/2026 | RNTLAT | Late Fee | 206 | 1,029.45 | 0.00 | 0.00 | 0.00 | 31,986.15 | C-243122 | 139117 | |
| 4/1/2026 | 4/1/2026 | 4/30/2026 | 04/2026 | OPXEST | Recoveries-Operating Exp | 206 | 435.59 | 0.00 | 0.00 | 0.00 | 32,421.74 | C-242990 | 138637 | |
| 4/1/2026 | 4/1/2026 | 4/30/2026 | 04/2026 | RNTBRO | Base Rent-Office | 206 | 9,991.44 | 0.00 | 0.00 | 0.00 | 42,413.18 | C-242991 | 138637 | |
| 4/3/2026 | 4/3/2026 | 4/3/2026 | 04/2026 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,427.03 | 31,986.15 | | 103097 | R-112019 |
| 4/15/2026 | 4/15/2026 | 4/15/2026 | 04/2026 | RNTLAT | Late Fee | 206 | 1,029.45 | 0.00 | 0.00 | 0.00 | 33,015.60 | C-259090 | 145454 | |
| 5/1/2026 | 5/1/2026 | 5/31/2026 | 05/2026 | OPXEST | Recoveries-Operating Exp | 206 | 435.59 | 0.00 | 0.00 | 0.00 | 33,451.19 | C-262079 | 146568 | |
| 5/1/2026 | 5/1/2026 | 5/31/2026 | 05/2026 | RNTBRO | Base Rent-Office | 206 | 9,991.44 | 0.00 | 0.00 | 0.00 | 43,442.63 | C-262080 | 146568 | |
| 5/4/2026 | 5/4/2026 | 5/4/2026 | 05/2026 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,427.03 | 33,015.60 | | 112219 | R-122038 |
| 5/15/2026 | 5/15/2026 | 5/15/2026 | 05/2026 | RNTLAT | Late Fee | 206 | 1,029.45 | 0.00 | 0.00 | 0.00 | 34,045.05 | C-275066 | 152522 | |
| 5/26/2026 | 5/26/2026 | 5/26/2026 | 05/2026 | RNTLAT | Rev 03/26 LAT - Chg in Error - Per KKrumm | 206 | -1,029.45 | 0.00 | 0.00 | 0.00 | 33,015.60 | C-287860 | 157892 | |
| 5/26/2026 | 5/26/2026 | 5/26/2026 | 05/2026 | RNTLAT | Rev 04/26 LAT - Chg in Error - Per KKrumm | 206 | -1,029.45 | 0.00 | 0.00 | 0.00 | 31,986.15 | C-287861 | 157892 | |
| 5/26/2026 | 5/26/2026 | 5/26/2026 | 05/2026 | RNTLAT | Rev 05/26 LAT - Chg in Error - Per KKrumm | 206 | -1,029.45 | 0.00 | 0.00 | 0.00 | 30,956.70 | C-287862 | 157892 | |
| 6/1/2026 | 6/1/2026 | 6/30/2026 | 06/2026 | OPXEST | Recoveries-Operating Exp | 206 | 435.59 | 0.00 | 0.00 | 0.00 | 31,392.29 | C-277917 | 153558 | |
| 6/1/2026 | 6/1/2026 | 6/30/2026 | 06/2026 | RNTBRO | Base Rent-Office | 206 | 9,991.44 | 0.00 | 0.00 | 0.00 | 41,383.73 | C-277918 | 153558 | |
| 6/3/2026 | 6/3/2026 | 6/3/2026 | 06/2026 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,427.03 | 30,956.70 | | 120705 | R-130518 |
| 7/1/2026 | 7/1/2026 | 7/31/2026 | 07/2026 | OPXEST | Recoveries-Operating Exp | 206 | 435.59 | 0.00 | 0.00 | 0.00 | 31,392.29 | C-294899 | 160807 | |
| 7/1/2026 | 7/1/2026 | 7/31/2026 | 07/2026 | RNTBRO | Base Rent-Office | 206 | 9,991.44 | 0.00 | 0.00 | 0.00 | 41,383.73 | C-294900 | 160807 | |
| 7/2/2026 | 7/2/2026 | 7/2/2026 | 07/2026 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,427.03 | 30,956.70 | | 129650 | R-139628 |
| 8/1/2026 | 8/1/2026 | 8/31/2026 | 08/2026 | OPXEST | Recoveries-Operating Exp | 206 | 435.59 | 0.00 | 0.00 | 0.00 | 31,392.29 | C-316792 | 169501 | |
| 8/1/2026 | 8/1/2026 | 8/31/2026 | 08/2026 | RNTBRO | Base Rent-Office | 206 | 9,991.44 | 0.00 | 0.00 | 0.00 | 41,383.73 | C-316793 | 169501 | |
| 8/7/2026 | 8/7/2026 | 8/7/2026 | 08/2026 | | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 0.00 | 0.00 | 10,427.03 | 30,956.70 | | 139471 | R-150260 |
| 8/18/2026 | 8/1/2026 | 8/31/2026 | 08/2026 | RNTLAT | 8/2026 Late Fee [Foundry] | 206 | 1,029.45 | 0.00 | 0.00 | 0.00 | 31,986.15 | C-323168 | 172475 | |
| 9/1/2026 | 9/1/2026 | 9/30/2026 | 09/2026 | OPXEST | Recoveries-Operating Exp | 206 | 435.59 | 0.00 | 0.00 | 0.00 | 32,421.74 | C-326966 | 173633 | |
| 9/1/2026 | 9/1/2026 | 9/30/2026 | 09/2026 | RNTBRO | Base Rent-Office | 206 | 9,991.44 | 0.00 | 0.00 | 0.00 | 42,413.18 | C-326967 | 173633 | |